ARCHIE R. KNUDSON, PLAINTIFF AND RESPONDENT, *v.*
EDGEWATER AUTOMOTIVE DIVISION, DEFENDANT AND·
APPELLANT.

No. 11859.
Submitted November 18, 1970.
Decided June 17, 1971.
Rehearing Denied July 20, 1971.
486 P.2d 596.

Korn, Warden & Walterskirchen, Kalispell, Merritt N. Warden and Gary R. Christiansen, argued, Kalispell, for appellant.

Murphy, Robinson, Heckathorn & Phillips, Kalispell, I. James Heckathorn, argued, Kalispell, for respondent.

MR. JUSTICE DALY delivered the Opinion of the Court.

This is a personal injury action by a mechanic employed by the Smith Motors of Polson, Montana, against the manufacturer of an automotive jack. The jack was designed and distributed for use by garages, service stations and auto repair shops. The jack had been purchased new by plaintiff's employer and was being used by plaintiff in his employment at the time he was injured. A jury in the district court of Flathead County, the Honorable Robert C. Sykes, district judge presiding, returned a general verdict in favor of the plaintiff for $99,907 and judgment was entered thereon. From this final judgment the defendant appeals.

Plaintiff Archie R. Knudson, while employed by Smith Motors at Polson, Montana, on July 19, 1963 as a mechanic, used a "Fleet" brand jack, Model 5-31, manufactured by defendant to raise the front end of an automobile.

The jack in question is designed to be placed at the front or rear of an automobile. It has horizontal metal arms encased in a metal sleeve and the arms overlap each other inside the sleeve. There are bumper saddles on each end of the arms which make contact with the automobile bumper so that the car can be raised. The arms can be extended or contracted horizontally to accommodate the car bumper to which it is to be fitted to raise the vehicle. The jack is designed so that the arms to remain rigid and hold the bumper properly and not roll or tilt forward and drop the vehicle, must overlap each other inside the sleeve. When maximum extension and minimum overlap of the arms is achieved the arm ends inside the sleeve contact a "roll pin" in the center of the sleeve. This is designed to stop the arms and prevent the arms from being over-extended, because upon over-extension the design allows the arms to turn. A word description of the jack function is difficult. The jack was demonstrated before the jury and was demonstrated by counsel before this Court. A visual observation clearly demonstrates a design that, without a foolproof pin—it not being capable of being visually inspected—would permit a jury to find as it did that the design was faulty.

Plaintiff extended the jack arms and raised the automobile, rolled under the car on his creeper, put his wrench onto the head of a bolt and that is all he remembered.

Warren P. Morse, shop foreman for Smith Motors, was listed as a witness by plaintiff at pretrial and several days prior to trial, which was to begin on Monday, November 10, 1969, advised he was to enter the hospital for back surgery. Upon motion and hearing the court ordered his deposition taken and his testimony was admitted at the trial by deposition. Morse testified he did not witness the accident but after assisting Mr. Knudson to the hospital returned to Smith Motors and examined the jack which had been used by Knudson. He stated he found the pin that stops the arms from

extending too far was broken and the top of the pin was still in place but the other part of the pin had dropped out through the bottom. He examined the pin and found it beat and bent with impressions on it from usage. It was bent in an "S" from the extension arms contact. The extension arms were tilted forward in an unnatural position. The jack in question had been purchased new from Polson Auto Parts on November 24, 1959 and had a useful life of approximately 15-20 years. Mr. Roy Curry, owner of Polson Auto Parts testified he tested the jack before delivery and there was a stop pin in place. He carried repair parts for the jack but had no inquiries from Smith Motors for parts. Mr. Morse testified the jack was in good condition and no repairs or alterations had been made to his knowledge at the time of the accident. Further, in his opinion it was not possible and there was no reason for anyone to have made any alteration to the jack until the accident.. He admitted, however, he did not have his eyes on the jack for the entire period up to the accident.

The pin from the jack was not salvaged by the garage and they placed a large 16 penny nail in its place and continued to use the jack for around six years until the trial. Therefore the jack when exhibited at trial was not in the same condition and the hole designed for the safety pin had become elongated from use with the nail. There was no other testimony offered by either party concerning the jack and pin or condition on the day of the accident. Mr. Knudson drew a sketch of his remembrance of the top of the pin and later retracted it on the basis he did not remember. Mr. Morse drew a sketch of the top of the pin as he remembered it, more or less of a mushroom top. These impressions were to a degree contradicted by Mr. Arthur Achterberg the design engineer for defendant. Achterberg produced a roll pin he testified was used in this jack when manufactured containing no head but explained it was pressed into place. However, on cross-examination he said the top of the pin is "peened" over

normally. He further testified its sole function was a safety feature to prevent over-extension. He testified to it being heat hardened to Rockwell C 46 to 50, equivalent to spring steel or file hard, which cannot be marked with a carbon file. Engineer Bell in his testimony contradicted this and testified to file marks on the roll pin which is exhibit "F"' in evidence. Achterberg testified on cross-examination that during 1955 to 1961 it came to their attention twice that a pin had fallen out of this model jack. He further agreed that without the stop pin the jack was not safe. If a mechanic on visual inspection failed to note an absent pin there was no other way to determine if the arms were over-extended. There are no visual marks or warnings on the jack.

Mr. Thomas M. Bell is a mechanical engineer who is employed as chief engineer for Mountain Mfg. Company and works primarily in design and studied in his education stress analysis of mechanical devices, strength of materials and mechanics of force factors, etc.

Bell testified he examined the jack and the pin used in the jack was not large enough to withstand the stresses that were placed on it; that the stops inside on the arms hit the pin, one high and one low and the pin will eventually break; that it constituted an unreasonably dangerous condition; that it could have been made safe economically in several different ways by design improvement. Both experts agreed the jack was safe if the arms were not extended past the pin and operated within the designed load limits. Bell testified that the nail replacement would be safer than the original roll pin.

There was considerable conflicting testimony about the use of safety stands under cars while on a jack but it was established through shop foreman Morse that it was not a shop requirement that they be used at Smith Motors especially in a case like this one when the plaintiff was only to be under the car for a brief time. He also testified that in placing the

stand under the machine the worker's body was partially exposed to danger in event the car fell.

As a result of the automobile falling on plaintiff Knudson's head he suffered the following injuries: he was rendered unconscious; suffered several skull fractures, fracture of the left maxilla with depression of the lateral wall, fracture of the inferior orbital ridge with displacement of the lateral fragment, fracture of the left zygoma and of the zygomatic arch, fracture of the right mandible with inversion of the anterior fragment; suffers double vision; misalignment of his jaws; partial destruction of sense of taste; has almost constant headaches; a fibrillary muscular twitching in the face; his mouth is drawn to the left; suffered injury to his ears and loss of hearing; damage to his eyes with loss of vision; injury to branches of the facial nerve; injury to the tri-facial nerve; constant abnormal sensations on the surface of his skin; suffers distortion of speech and pronunciation of words; dryness and distortion of his tongue and lips when talking; soreness of eyes and blurring when under stress and exertion; damage to his teeth; suffers from a nasal discharge and his sinus passages have been affected; his right ear drum was broken and he has a constant ringing and hissing in his ears; suffered pain and will continue to suffer pain in the future.

Plaintiff filed this suit on June 29, 1966. Discovery was had and a pretrial order entered which limited the issues and at conclusion of plaintiff's case and on motion of defense the court further limited the issues contained in the pretrial order to 4(a), 4(h) and 4(i) which are as follows:

"4(a) Said jack was manufactured in such manner that when the arms were extended and weight placed on them, the arms would tilt allowing the supported object to fall from the jack."

"4(h) That the jack was manufactured without adequate safeguards to prevent objects lifted by it from falling."

"4(i) That the Defendant negligently failed to inspect said

jack for defects in materials and workmanship and negligently failed to warn Plaintiff of the dangerous characteristics and propensities of said jack."

Because of this negligence plaintiff asked for $150,000 general damages, $12,500 past loss of wages and $25,000 loss of future earning capacity.

The defense admitted it manufactured this jack but denied the remaining allegations and asserted various affirmative defenses including contributory negligence and assumption of risk.

The case came on for jury trial in the district court on November 10, 1969. At the conclusion of plaintiff's evidence the defense moved for summary judgment and dismissal which were denied. Motions to strike were granted in part and denial in part as set forth.

At the conclusion of all evidence the defense moved for dismissal and a directed verdict and further motions to strike, all of which were denied. The jury was instructed on the law and the case submitted to them. The jury submitted a written question concerning the weight to be given testimony of Warren P. Morse which was entered by deposition. The court prepared special jury instruction No. "A" which was read to the jury and submitted to them. The jury returned a general verdict in favor of the plaintiff for $99,907 and judgment wasentered thereon. After denial of defense motions for judgment notwithstanding the verdict and a new trial, the defendant appeals from the judgment.

The defendant has raised numerous specific allegations of error and placed them in four classifications for review. They are (1) insufficiency of evidence, (2) affirmative defenses, (3) specific errors by the court, (4) excessive damages. Many of the specific allegations are interrelated and will be discussed generally.

The defendant bases a large part of his argument on inter-

pretations of words and whether or not certain issues were raised by the pretrial order of October 28, 1969.

The defendant as a basis for trial error and insufficiency of evidence urges strongly that the issue of *"the design of the jack"* was not raised by the pretrial order. We disagree. Although the word "design" was not specifically used the order is replete with references to faulty design and particularly paragraph 4, sections (a) and (i) not stricken by the court after the plaintiff's case was submitted. With reference to paragraph 4(a), the defendant quarrels with the meaning of the word *"extended"* because the plaintiff did not "elaborate on its meaning." There is no doubt in the Court's mind as to the meaning intended and there certainly is no injustice demonstrated in the record due to misunderstanding of the terms or wording used in the court's order.

Paragraph 4(h) is attacked in much the same manner, i.e., defendant contends everyone agrees the jack was safe so long as the arms *overlap* and do not become *over-extended,* etc. This in turn means using the jack *"in the manner for which it was constructed."*

There is a considerable amount of evidence in the record by the defendant's design engineer who designed the jack to establish the contrary. This jack was designed and intended by the manufacturer to have been used exactly as it was. The arms are to be extended to accommodate the vehicle being raised. The testimony reveals the jack was intended to be used by all kinds of people; no inspection was anticipated before each use; if the "roll pin" was broken or gone there was no other means of being warned of even a slight over-extension which presented danger and an unknowing over-extension does not necessarily imply misuse of the jack.

The defendant further claims error by the court in admitting the testimony of shop foreman Morse by deposition, but cites no authority in support of this contention.

On the preceding Thursday, before trial on Monday,

Mr. Morse called and advised that he was entering the hospital on the Sunday prior to trial and would not be available. Counsel for the defendant was immediately notified of the unavailability of the witness. The objections raised by defendant's counsel were not that it was inconvenient to take the deposition but that the witness should be present. This argument was made to the court and the court weighed the pros and cons and felt that the advantage of taking the deposition outweighed the disadvantages of postponing trial considering the accident occurred in 1963, the action filed in 1966 and this was November 1969. We find no abuse of the court's discretion in not postponing the trial. Another specific error and a basis for insufficient evidence is the contention that engineer Thomas M. Bell was not qualified as an expert to testify, the main objection being that he was not employed as an engineer in the "field of lifting equipment." He only examined the jack a week prior to trial. He was not familiar with the jack or similar equipment in 1963 or 1959. The defendant ignores the fact that the lifting mechanism of the jack was not in issue. The point in issue was the negligent manufacture in terms of material, workmanship and design as it concerned the "roll pin" in the center of the lifting arm. Mr. Bell, a graduate mechanical engineer and chief engineer for Mountain Mfg. Company, his job being in design of heavy logging equipment, had studied and had experience in design, stress analysis, strength of materials and mechanics of force factors.

This Court has taken notice of the qualifications which must be shown to qualify a witness to be expert in a particular field and thus be allowed to provide critical testimony in a jury trial. The most critical considerations to be made are the qualifications of any man to give his opinion based on his knowledge or training as it pertains to basic principles of science, art or trade. This Court recognizes the gravity of this determination of scientific knowledge but does not agree

with defendant's contention that one must actually have practical experience in a given industry in order to qualify as an expert in litigation involving its products. This would place an "onerous burden on plaintiffs" in relation to the key experts of a small industry which would normally be available to the defendant as was stated in Trowbridge v. Abrasive Co. of Philadelphia, 190 F.2d 825 (3rd Cir., Pa., 1951). In *Trowbridge* the following language can be found:

"The qualification of an expert is a matter peculiarly within the discretion of the trial judge. It has been reiterated time and again that an appellate court will reverse on this ground only when the decision of the trial judge is clearly erroneous."

Montana authority to this effect can be found in Graham v. Rolandson, 150 Mont. 270, 285, 435 P.2d 263, 271, which states:

" 'expert,' i.e., a person skilled on a question of science * * *. The opinion of a witness on a material question of science, art, or trade in which he is skilled is admissible in evidence. (Section 93-401-27, R.C.M. 1947). The determination of the qualification of a skilled or expert witness is a matter largely within the discretion of the trial judge, and in the absence of a showing of abuse, ordinarily will not be disturbed (Nesbitt v. City of Butte, 118 Mont. 84, 163 P.2d 251; Krohmer v. Dahl, 145 Mont. 491, 402 P.2d 979)."

We therefore find no merit in defendant's objection to Mr. Bell's qualifications as an expert.

█ Defendant further alleges the manufacturer is not an insurer and that the fact an accident happens involving a manufacturer's product does not demonstrate negligence or show the jack to be defective. With this we agree, but this is not our case.

When the plaintiff has prevailed in the district court we must view the evidence in the light most favorable to him. Strong v. Williams, 154 Mont. 65, 460 P.2d 90. Further we must only review the evidence to determine if there was substantial evidence to support the verdict of the jury and we

must accept the evidence believed by the jury unless that evidence is so inherently impossible or improbable as not to be entitled to belief. Nelson v. C. & C. Plywood Corp., 154 Mont. 414, 465 P.2d 314.

Defendant claims lack of evidence of defect when sold by the manufacturer. Defendant itself through its expert from the factory identified the jack as manufactured by defendant in 1959 and produced an exact replica of the roll pin placed in the jack and with Mr. Curry, owner of Polson Auto Parts, identified the jack as sold to Smith Motors in 1959 in new condition. Curry tested the jack by extending the arms, which had been wired for safety in shipping, and testified a stop pin was in the jack. He further testified he carried repair parts and had no call for them from Smith Motors. Defendant's expert testified the manufacturer did not expect a mechanic to make close inspection of the jack before use. He estimated the useful life of the jack at 15 years. The only testimony concerning the condition at the time of the accident was by foreman Morse and he was definite in his opinion that the jack had not been altered and the pin was broken and was the pin that was in the jack when purchased. His description of the "S" bend in the broken pin squares with engineer Bell's testimony that the pin would break as a result of one arm striking the pin high and the other low in different spots on opposite sides of the pin.

Defendant urges conclusive evidence of alteration of the jack by virtue of the figures drawn by plaintiff Knudson and foreman Morse, of their remembrance of the head of the roll pin. First, Knudson withdrew his testimony on rebuttal and upon reflection did not have exact remembrance after six years. Morse drew a mushroom figure as his remembrance of the top of the pin. Mr. Achterberg, the defendant's witness who designed the jack, explained how the roll pin was pressed into the jack but offered this impression of the top of the pin on direct examination:

"Q. Now, Mr. Achterberg, is this pin the one that was used in the hydraulic fronted lift, plaintiff's Exhibit 1? Is it a pin with a head on it? A. No, this is what we term a headless type of a pin."

On cross-examination Mr. Achterberg offered a further description of the head of the roll pin:

"Q. Thank you, you may sit back down. Now, this pin, this roll pin, as I understand it—is it longer than the housing itself? A. Yes.

"Q. And is it peened over normally? A. The top is peened over.

"Q. And what happened at the top, does it just stick out at the top? A. Yes."

Even though the testimony and drawings concerning the head of the pin might tend to confuse the jury there is ample credible circumstantial and direct evidence for the jury to conclude that the pin in the jack the day of the accident was the original pin.

The defendant argues there was ample evidence of due care and testing. However, this evidence tended more to the lifting quality of the jack. One thousand up and down tests at 3,250 pounds, four hours hold test under static weight and field tests for three months in the hands of selected users. There was no particular demonstration as to the tests given the "roll pin".

Engineer Bell's testimony being deemed admissible resolves the issues of evidence as it concerns the design and roll pin quality, if believed by the jury. Further the design engineer for the defendant admitted to at least two complaints of this pin falling out prior to this accident.

The defendant contends that the court was in error when it refused to honor defense motions at the close of plaintiff's case and at the close of all testimony by virtue of conclusive evidence of contributory negligence and assumption of risk. The contributory negligence contention seems to root itself

in part on the general argument that over-extention would be improper use and thus the fault of the operator. Defendant also bases its contentions on the fact that Mr. Knudson broke the roll pin and therefore caused his own accident. There is no evidence in the record to bear this out. Also lack of inspection on the part of Knudson is given as a factor, however, the record does not bear out this contention.

■ The issue of the nonuse of the safety stand is claimed assumption of risk of a *known hazard*. The record, again, does not reflect any knowledge of the hazard. The defendant offered no citations in support of these contentions but seems to rely on a fact issue which was properly submitted to the jury with instructions by the court.

The specific questions answered by engineer Bell and cited as error are found to be without merit in view of the holding heretofore on the issue of design and the general discussion concerning the evidence in the record.

■ The defendant raises the issue of excessive damages which are out of proportion to the injuries suffered and the award was measured by the passion and prejudice of the jury. Defendant attempts to speculate how the damages were apportioned in a general verdict, an argument we cannot consider. There is substantial evidence of serious and permanent injuries and that six years later at the trial plaintiff still has pain and discomfort and no change in the future is likely, all of which entitles the plaintiff to damages. The evidence demonstrates the plaintiff has a more difficult time working and cannot do as much as before the accident because of his physical condition and lack of strength. He can no longer work up high because of his eye injuries. We find no evidence of passion or prejudice in the record nor does the award of $99,907 seem so grossly out of proportion to the injuries as to shock the conscience of this Court. The amount of the award is the proper function of the jury and it should not

be disturbed where as here there is substantial evidence to justify the jury findings.

In considering the specific objections to the various instructions it might be well to comment on a portion of the court's instruction No. 1 which reads:

"* * * If in these instructions any rule, direction or idea has been stated in varying ways, no emphasis thereon is intended by me, and none must be inferred by you, and for that reason, you are not to single out any certain sentence or any individual point or instruction, and ignore the others, but *you are to consider all the instructions as a whole, and to regard each in the light of all the others.* * * *" (Emphasis added.)

Defendant contends error in instruction No. 19:

19. "The manufacturer of a product that is reasonably certain to be dangerous if negligently made has a duty to exercise reasonable care in the design, testing, inspection and manufacture of such product so that the product may be safely used in a manner and for the purpose for which it was made. A failure to fulfill that duty is negligence."

Defendant contends that instruction No. 19 places a duty on the manufacturer to manufacture his product so it cannot be misused and uses language, "dangerous propensities", that infers strict liability. This cannot be read into the instruction and if the instruction is read together with instruction Nos. 17 and 18, hereinafter quoted, as required by instruction No. 1, there is no reasonable chance to obtain the result complained of.

17. "You are instructed that a manufacturer *does not have the status of an insurer as respects the design of his product since it is obvious that virtually any article,* of whatever type or design, is capable of producing injury when put to particular uses or misuses. A manufacturer has no duty so to design his product as to render it wholly incapable of producing

injury, nor has he any duty to furnish a machine that will not wear out." (Emphasis added.)

18. "A manufacturer of a product and its component parts is entitled to assume that it would be used in a reasonable manner and for the purpose for which it is intended. If you should find that whatever inury or damage the plaintiff suffered in this case resulted solely from his improper use or from a third person's improper installation of a part or component, which could not reasonably be foreseen by the defendant, then the plaintiff cannot recover damages from the defendant manufacturer."

Defendant raises the same objection to instruction No. 20 which follows:

20. "A manufacturer who manufactures and supplies a product for another's use which it knows or has reason to know is dangerous or is likely to be dangerous for the use for which it is supplied, has a duty to use reasonable care to give warning of the dangerous condition of the product or of the facts which make it likely to be dangerous to those whom he should expect to use the product or be endangered by its probable use, if the manufacturer has reason to believe that they will not realize its dangerous condition. A failure to fulfill that duty is negligence."

Instruction No. 20 can be resolved in the same manner as instruction No. 19, if read together with instructions Nos. 17 and 18. While it is true the term dangerous may be used in a strict liability situation it is not a specific term that applies only to strict liability cases. You may have an "inherently dangerous" article in strict liability but a potentially dangerous article or situation in negligence. See Restatement of the Law, Torts 2nd, Chapter 14.

Instruction No. 14 reads:

14. "One test that is helpful in determining whether or not a person was negligent is to ask and answer whether or not, if a person of ordinary prudence had been in the same situation

and possessed of the same knowledge, he would have foreseen or anticipated that someone might have been injured by or as a result of his action or inaction. If such a result from certain conduct would be foreseeable by a person of ordinary prudence with like knowledge and in like situation, and if the conduct reasonably could be avoided, then not to avoid it would be negligence."

Error is claimed because instruction No. 14 is not limited to a particular time and the word "might" lends the connotation the manufacturer is an insurer. This is a definition of negligence which applies to both parties and in no sense could it be prejudicial in any manner claimed.

Defendant claims error in instruction No. 23, a more or less standard instruction on damages, in that it does not indicate that damages come only after liability is established and the complaint is not evidence of damages. Both criticisms are, as stated before, adequately covered by the instruction read as a whole with specific attention to instructions 6, 7, 8, 12 and 13.

We have examined the record and the instructions refused by the court and claimed as error by the defendant and find the court properly instructed the jury on all issues properly raised in the trial.

The judgment of the trial court is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES JOHN C. HARRISON and CASTLES, concur.