No. 12349

IN THE SUPREME COURT OF THE STATE OF MONTANA

1973

---

RUBY BRANDENBURGER, Administratrix
of the Estate of CLARENCE R.
BRANDENBURGER, deceased,

Plaintiff and Respondent,

-vs-

TOYOTA MOTOR SALES, U.S.A., INC.,
and TOYOTA MOTOR CO., LTD.,

Defendants and Appellants,

TAFFORD OLTZ,

Defendant.

---

Appeal from:   District Court of the Eighteenth Judicial District,
Honorable W. W. Lessley, Judge presiding.

Counsel of Record:

For Appellants:

Berg, O'Connell, Angel and Andriolo, Bozeman, Montana.
Charles F. Angel argued, Bozeman, Montana

For Tafford Oltz:

Bennett and Bennett, Bozeman, Montana.
Lyman H. Bennett, Jr., argued, Bozeman, Montana.

For Respondent:

Landoe, Gary and White, Bozeman, Montana.
Hjalmar B. Landoe and Donald E. White argued, Bozeman,
Montana.

---

Submitted: June 18, 1973

Filed: AUG 7 - 1973          Decided: AUG 7 - 1973

---

Clerk

Mr. Justice John C. Harrison delivered the Opinion of the Court.

This is an appeal from a judgment and denial of a motion for judgment in accordance with motion for directed verdict or for new trial in an action tried in the district court of the eighteenth judicial district, county of Gallatin. The case was tried to a jury which returned a verdict in favor of plaintiff Ruby Brandenburger, administratrix of the estate of Clarence R. Brandenburger, deceased. Defendants in the action were Tafford Oltz, Toyota Motor Sales, U.S.A., Inc., and Toyota Motor Co., Ltd. Tafford Oltz did not appeal the judgment, but appeared on appeal as a cross-complainant against the remaining defendants for any sums he might be required to pay plaintiff. The jury verdict in district court was against all defendants in the amount of $125,000.

The accident in question occurred in the late afternoon of August 3, 1970. Tafford Oltz and his friend and fishing partner, Clarence R. Brandenburger, were driving south from Bozeman, Montana on U.S. Highway 191 to do some fishing. Oltz was driving his 1969 Toyota Land Cruiser which he had purchased in February 1969 at Rochester, Minnesota. The weather was clear, visibility good and the road was dry. Approximately eight miles south of Bozeman, according to the testimony of Oltz, Brandenburger yelled at him to look out for rocks on the road which Oltz described as about fist sized and scattered over the road. He swerved to the right to avoid hitting rocks, his vehicle left the highway, overturned, and the top of the vehicle came off. Both men were thrown out of the car through the opening created by the top coming off. Brandenburger was crushed by the rolling car; Oltz was injured.

There was conflict in the testimony as to what happened when the vehicle left the road and went onto the soft graveled shoulder. At the time of the accident Oltz estimated he was traveling between 50 and 60 miles per hour. The investigating highway patrolman's measurements indicated the Oltz vehicle traveled with the left wheels on the pavement and the right wheels off the pavement some 129 feet, 8 inches, whereupon the left wheels also dropped onto the shoulder and the vehicle traveled down the barrow pit

parallel to the road another 83 feet, 7 inches. At this point, the vehicle made a sharp left turn in an attempt to regain the road, skidded sidewards and overturned. The vehicle rolled on the passenger side first, and as it continued to roll, assumed an upright position at which time the roof "popped" off, and the eyewitnesses observed the bodies of the passengers flying out. The vehicle continued to roll and it was apparently at this time that it crushed Brandenburger. The vehicle was equipped with seat belts, but neither man was wearing one at the time of the accident.

The roof panel of the Toyota Land Cruiser was constructed of several layers of laminated fiber glass, riveted to a steel rail, which in turn was bolted to the steel body of the cab. The rivets were spaced approximately 4 inches apart around the roof and were 1/8 inch in diameter. Oltz testified when he purchased the Land Cruiser he was aware of the fiber glass top and that it had no roll bars or supports of steel.

This is a products liability case. Plaintiff maintained the fact the roof "popped off" was a result of defective design. The respondent conceded the allegedly faulty design did not cause the accident but contended such design greatly increased the chances of death in an accident. The issue here is the liability of Toyota Motor Sales, U.S.A., Inc., and Toyota Motor Co., Ltd.

Appellants present four issues for this Court's consideration which we summarize in this manner:

1. Whether strict liability in tort should have been submitted to the jury?

2. Whether there was substantial evidence showing negligence on the part of the manufacturer, and if so, was the defect resulting from such negligence a proximate cause of Clarence R. Brandenburger's death?

3. Whether there was an irregularity in the proceedings which prevented the manufacturer and distributor from having a fair trial when plaintiff and defendant Oltz settled the matter between themselves during the trial?

- 3 -

Before discussing the issues, we reiterate the rules stated in Strong v. Williams, 154 Mont. 65, 68, 460 P.2d 90:

> "It is well settled in this jurisdiction that wherever there is a conflict in the evidence this Court may only review the testimony for the purpose of determining whether there is any substantial evidence in the record to support the verdict of the jury, and we must accept the evidence there found as true, unless that evidence is so inherently impossible or improbable as not to be entitled to belief. Where the evidence is conflicting, but substantial evidence appears in the record to support the judgment, the judgment will not be disturbed on appeal, and this is especially true when the district court, as here, has passed upon the sufficiency of the evidence on motion for a new trial and upheld its sufficiency. Batchoff v. Craney, 119 Mont. 157, 172 P.2d 308; Wallace v. Wallace, 85 Mont. 492, 279 P. 374, 66 A.L.R. 587. The evidence must be viewed in the light most favorable to the prevailing party. If that evidence sustains the verdict then we must sustain the action of the trial judge."

See also: State Highway Commission v. Vaughan, 155 Mont. 277, 470 P.2d 967; Knudson v. Edgewater Automotive Division, 157 Mont. 400, 486 P.2d 596.

Issue 1. Whether strict liability in tort should have been submitted to the jury?

Counsel for all parties recognize that this Court has not previously squarely faced the proposition as to whether or not strict liability is the applicable law in Montana. It was considered in Jangula v. United States Rubber Company, 147 Mont. 98, 410 P.2d 462, 149 Mont. 241, 425 P.2d 319, but under the facts there it was deemed not applicable. Appellants argue this Court has refused to apply the doctrine of strict liability in three recent cases, therefore it is not the law of Montana and the trial court erred in its instructions to the jury. We will consider each of the cases cited by appellants to show that in each instance the case was decided on grounds other than strict liability.

Knudson v. Edgewater Automotive Division, 157 Mont. 400, 486 P.2d 596: There we held that the trial court did not insert strict liability into the case, under the instructions given. As to the instructions given, we noted an instruction that a manufacturer of "a product that is reasonably certain to be dangerous if negligently made has a duty to exercise reasonable

- 4 -

care in the design, testing, inspection and manufacture of such product so that the product may be safely used in a manner and for the purpose for which it was made", when considered with the other instructions, and the instruction to consider all the instructions as a whole, did not improperly imply strict liability on the manufacturer.

Duchesneau v. Silver Bow County, 158 Mont. 369, 378, 492 P.2d 926:

In this case the Court said:

> "The gist of the claim by Wilson Motors and its property damage insurer against Roberts and Mack Trucks is negligent design and installation of the powering steering unit, constituting the proximate cause of the accident."

But, this case was argued on negligence and not strict liability. However, Justice Haswell noted and it is of interest here, that:

> "The foregoing testimony indicates the power steering unit was purchased in 1967 from Mack Trucks, and if it was in fact negligently designed, there is a possible basis for strict liability against Mack Trucks."

Ford v. Rupple, ___ Mont. ___, 504 P.2d 686, 691, 29 St.Rep. 1081:

This case involved an action against General Motors and others for injuries sustained by a passenger riding in a 1968 Corvette involved in a sideswipe collision /went out of control and collided headon with another vehicle. Under the facts presented, the trial court granted summary judgment in favor of General Motors and plaintiff appealed. This Court upheld the district court's ruling. Mr. Justice Daly, after thoroughly reviewing the cases cited and text writers, concluded:

> "In Mang v. Eliasson, 153 Mont. 431, 458 P.2d 777, this Court rejected any doctrine of abstract foreseeability and affirmed the doctrine of reasonable foreseeability, but in that case found no necessity to reach the law of 'causation' absent a finding of duty. However, causation was most recently discussed in terms of proximate cause and the 'but for' rule affirmed in DeVerniero v. Eby, ___ Mont.___, 496 P.2d 290, 293, in this language:
>
> "'Proximate cause is a twofold legal concept which may limit liability depending upon the existence of (1) an intervening act and (2) the unforeseeability of that intervening act. This Court stated in Sztaba v. Great Northern Ry., 147 Mont. 185, 195, 411 P.2d 379, 385:
>
> "'"Causation is a fact. It is important to determine causation first to avoid its confusion with the issues to follow. This

- 5 -

is not a relationship between negligence and injury, but
rather a causal relation between conduct and hurt, both of
which are factual concepts. It is only after the causal
relationship, duty, and its scope are found that the negligence
issue is reached. 61 Col.L.R. 1401.

"'"The test most generally employed in determining causation
is the 'but for' test. Montana has adopted this test in
numerous cases.

"'"Proximate cause is one 'which in a natural and continuous
sequence, unbroken by any new, independent cause, produces
the injury, and without which the injury would not have
occurred.' Stroud v. Chicago M. [&] St. P. & P. Ry. Co.,
75 Mont. 384, 393, 243 P. 1089, 1092." (Emphasis added.)'

"The principle urged by plaintiff under the facts of this
case falls into the area of 'abstract foreseeability' con-
demned in Mang and fails to meet the law in relation to
causation as it exists in Montana."

This brings us to the instant case and the question of whether

Montana should adopt the doctrine of strict liability. We note here that

both the federal district court of Montana and the Ninth Circuit Court of

Appeals have considered Montana case law and have anticipated action by

this Court, in cases heard in those courts recently. Federal Judge Russell

E. Smith in Hornung v. Richardson-Merrill, Inc., 317 F.Supp., 183, 184,

held:

> "The tort limitation is applied to the warranty count
> for these reasons: In the absence of a controlling
> decision of the Supreme Court of the State of Montana,
> the federal courts in Montana sitting in diversity cases
> have looked to and adopted as the applicable rule of law
> in Montana the Restatement of the Law of Torts, Second,
> and the strict liability rule announced therein. The
> strict liability rule will be applied in this case."

The Ninth Circuit Court noted in the Sabin oral vaccine case,

Davis v. Wyeth Laboratories, Inc., 399 F.2d 121, 127:

> "We can find no Montana decision in point on the issue
> of a drug manufacturer's duty to warn of dangers inherent
> in its product. Privity of contract between buyer and
> seller as a prerequisite to recovery in an implied war-
> ranty action has long been abolished in that state in
> cases involving food, and strict liability has been
> imposed on those who sold it. It would seem that the
> same approach would be adopted by the Montana Supreme
> Court in cases involving drugs meant for internal use.
> Faced with the absence of controlling state precedent,
> we choose to assume that Montana would follow the major-
> ity of other states in finding that liability can attach
> to the sale of drugs, in either tort or warranty, despite
> lack of privity, and would adopt the views set forth

below on the manufacturer's duty to warn of dangers in
'nondefective' but potentially harmful products. * * *

"The clearest statement of the law as it exists today
is in our view that set forth in the Restatement (Second)
of Torts (1965). Relevant to our case are Section 402A
and comments j and k. * * *"

The trend seems to be to adopt the theory of strict liability

and it has now been adopted by a majority of the states.

In consideration of the instant case as to the adoption of the

doctrine of strict liability, we first look to the definition of that theory.

We adopt the definition, as other jurisdictions have, set forth in 2 Restate-

ment of Torts 2d §402A:

"(1) One who sells any product in a defective condition
unreasonably dangerous to the user or consumer or to his
property is subject to liability for physical harm thereby
caused to the ultimate user or consumer, or to his property,
if

"(a) The seller is engaged in the business of selling
such a product, and

"(b) it is expected to and does reach the user or
consumer without substantial change in the condition
in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in
the preparation and sale of his product, and

"(b) the user or consumer has not bought the product
from or entered into any contractual relation with
the seller."

In Lechuga, Inc. v. Montgomery, 12 Ariz. App. 32, 467 P.2d 256, 261,

Judge Jacobson in a concurring opinion discussed the reasons for the applica-

tion of the doctrine of strict liability to that case:

"It is apparent from a reading of the Restatement,
and the leading cases on this subject, that the doctrine
of strict liability was evolved to place liability on the
party primarily responsible for the injury occurring, that
is, the manufacturer of the defective product. This, as
Justice Traynor stated in his concurring opinion in Escola
v. Coca Cola Bottling Co. of Fresno, 24 Cal.2d 453, 150
P.2d 436 (1944), is based on reasons of public policy:

"'If public policy demands that a manufacturer of goods
be responsible for their quality regardless of negligence
there is no reason not to fix that responsibility openly.'
150 P.2d, at 441.

"These public policy considerations have been variously enumerated as follows:

"(1)   The manufacturer can anticipate some hazards and guard against their recurrence, which the consumer cannot do.   Restatement, supra, comment c.

"(2)   The cost of injury may be overwhelming to the person injured while the risk of injury can be insured by the manufacturer and be distributed among the public as a cost of doing business.   Greenman v. Yuba Power Products, Inc. [59 Cal.2d 57], 27 Cal.Rptr. 697, 377 P.2d 897 (1962).

"(3)   It is in the public interest to discourage the marketing of defective products.   Escola v. Coca Cola Bottling Co. of Fresno, supra.

"(4)   It is in the public interest to place responsibility for injury upon the manufacturer who was responsible for its reaching the market.   Greenman v. Yuba Power Products, Inc., supra.

"(5)   That this responsibility should also be placed upon the retailer and wholesaler of the defective product in order that they may act as the conduit through which liability may flow to reach the manufacturer, where ultimate responsibility lies.   Vandermark v. Ford Motor Co. [61 Cal.2d 256], 37 Cal.Rptr. 896, 391 P.2d 168 (1964).

"(6)   That because of the complexity of present day manufacturing processes and their secretiveness, the ability to prove negligent conduct by the injured plaintiff is almost impossible.   Escola v. Coca Cola Bottling Co. of Fresno, supra.

"(7)   That the consumer does not have the ability to investigate for himself the soundness of the product. Santor v. A and M Karagheusian, Inc. 44 N.J. 52, 207 A.2d 305 (1965).

"(8)   That this consumer's vigilance has been lulled by advertising, marketing devices and trademarks. Concurring opinion, Lockwood, J., Nalbandian v. Byron Jackson Pumps, Inc., 97 Ariz. 280, 399 P.2d 681 (1965).

"Inherent in these policy considerations is not the nature of the transaction by which the consumer obtained possession of the defective product, but the character of the defect itself, that is, one occurring in the manufacturing process and the unavailability of an adequate remedy on behalf of the injured plaintiff."

We recognize this is a major change in Montana's tort law by way of judicial decision, but as Chief Justice Vanderbilt of the New Jersey Supreme Court said in State v. Culver, 23 N.J. 495, 129 A.2d 715, 721, cert. denied 354 U.S. 925, 77 S.Ct. 1387, 1 L ed 2d 1441:

- 8 -

"One of the great virtues of the common law is its
dynamic nature that makes it adaptable to the require-
ments of society at the time of its application in court."

Issue 2. Whether there was substantial evidence showing negli-

gence on the part of the manufacturer, and if so, was the defect resulting

from such negligence a proximate cause of Clarence R. Brandenburger's death?

The adoption of the doctrine of strict liability does not relieve

the plaintiff from the burden of proving his case. Vital to that proof is

the necessity of proving the existence of a defect in the product and that

such defect caused the injury complained of.

Inasmuch as this is a "second collision" case, we recognize that

the design defect in the vehicle did not cause the accident. Generally

injury to car occupants results not from the immediate accident of one car

hitting another, commonly called "first collision" but from the ensuing

impact upon persons being tossed around the interior of the car, or as here,

being thrown through the roof, or "second collision". While the construc-

tion of the vehicle is not the cause of the accident, it is most often the

contributing factor in the case of "second collision" injuries. In the

recent years courts have held that where the manufacturer's negligence in

design causes an unreasonable risk to be imposed upon the user of its pro-

ducts, the manufacturer should be liable for the injury caused by its

failure to use reasonable care in design. These injuries are readily forsee-

able as an incident to the normal and expected use of the car. While auto-

mobiles are not made for the purpose of colliding with each other, a frequent

and inevitable contingency of normal automobile use will result in collisions

and injury-producing impacts. In Larsen v. General Motors Corporation, 391

F.2d 495, the court speaking concerning the "second collision" said:

> " * * * No rational basis exists for limiting recovery
> to situations where the defect in design or manufacture
> was a causative factor of the accident, as the accident and
> the resulting injury, usually caused by the so-called
> 'second collision' of the passenger with the interior
> part of the automobile, all are forseeable. Where the
> injuries or enhanced injuries are due to the manufacturer's
> failure to use reasonable care to avoid subjecting the
> user of its products to an unreasonable risk of injury,

- 9 -

general negligence principles should be applicable * * *".
See too: Ford Motor Company v. Zahn, 265 F.2d 729; Carpini
v. Pittsburgh and Weirton Bus Company, 216 F.2d 404.

Accordingly the duty of Toyota to provide a safe roof is not eliminated simply because the defective roof did not cause the accident.

Accepting this case as a "second collision" case, it must be determined whether there can be liability for the alleged defective construction of the vehicle.

Appellants contend, relying on Ford, that respondent's position is that appellants owed a duty to manufacture a "crash proof" vehicle. Not so! The law does not require such an obligation. Greco v. Bucciconi Engineering Co., 407 F.2d 87.

It is of import here to set forth the evidence needed to prove the defect. Although appellants do not directly make the claim that respondent had to introduce direct evidence that the design of the roof of the Land Cruiser was faulty, it is clear that they would have us adopt this standard. However, the better rule is to permit proof of defect to be established by circumstantial evidence and inferences therefrom, as well as by direct evidence.

The essential rationale for imposing the doctrine of strict liability in tort is that such imposition affords the consuming public the maximum protection from dangerous defects in manufactured products by requiring the manufacturer to bear the burden of injuries and losses enhanced by such defects in its products. If this be so, it requires little imagination to see that if a strict rule of direct evidence was required, the supposed benefit of the theory of strict liability would be lost to the consuming public. The Eighth Circuit Court of Appeals said in Lindsay v. McDonnell Douglas Aircraft Corp., 460 F.2d 631, 639:

> "There would be little gain to the consuming public if the courts would establish a form of recovery with one hand and take it away with the other by establishing impossible standards of proof. The proof required in a strict liability case must be realistically tailored to the circumstances which caused the form of action to be created."

Lindsay v. McDonnell Douglas Aircraft Corp., 352 F.Supp. 633.

- 10 -

We adopt the following standard of proof, as set forth by the Hawaii Supreme Court in Stewart v. Budget Rent-A-Car Corp., 52 Haw. 71, 470 P.2d 240, 243, as the acceptable type of evidence to be used by a plaintiff to prove a defect in a manufacturer's or distributor's product, in a strict liability case:

> "The nature and quality of evidence used in products liability cases to show the defect and the nexus between the defect and accident naturally varies. The most convincing evidence is an expert's pinpointing the defect and giving his opinion on the precise cause of the accident after a thorough inspection. If an accident sufficiently destroys the product, or the crucial parts, then an expert's opinion on the probabilities that a defect caused the accident would be helpful. If no such opinion is possible, as in the present case, the user's testimony on what happened is another method of proving that the product was defective. If the user is unable to testify, as where the accident killed him or incapacitated him, no other witness was present at the time of the accident, and the product was destroyed, the fact of the accident and the probabilities are all that remain for the party seeking recovery. At this point the plaintiff can attempt to negate the user as the cause and further negate other causes not attributable to the defendant. These kinds of proof introduced alone or cumulatively are evidence which help establish the presence of a defect as the cause of the damage."

See also:  Franks v. National Dairy Products Corporation, 414 F.2d 682; Reader v. General Motors Corp., 107 Ariz. 149, 483 P.2d 1388; Brownell v. White Motor Corp., 260 Ore. 251, 490 P.2d 184; Prosser, Law of Torts, 4th Ed., § 103.  50 Minn.L.Rev. 791; 2 Frumer, Products Liability, § 16A[4][e].

Turning now to the record, we find appellants failed to introduce expert testimony contradicting that of respondent instead of contenting themselves with cross-examination of respondent's witnesses.  Hence, there was no expert testimony, indeed no testimony at all, to offset that introduced by respondent.

Respondent's expert witness, Prof. Ralph Challender of the engineering school at Montana State University, testified at length as to two defects in the Land Cruiser manufactured by Toyota; (1) that the vehicle was unstable and had a tendency to roll, (2) that the roof was not safe.  In giving his testimony Prof. Challender compared the Toyota Land Cruiser with the Willys

Jeep, the International Scout, Ford Bronco and the British Land Rover. Summarizing his testimony he noted that in comparison to conventional automobiles, because of the short wheel base of such vehicles, all four wheel drive vehicles are less stable in an exposure condition, such as sitting on a sidehill, and rounding corners, where the centrifugal force effect becomes more pronounced making the tendency to tip greater. He noted that manufacturers of such vehicles should have anticipated this facet, due to the type of use contemplated, and advertised accordingly.

In assessing the various vehicles compared as to the structure above waist line, he noted only one other had a fiber glass top, the Chev Blazer--but that vehicle has in addition a fiber glass liner inside, and the structural parts were sandwiched in between the inner and outer faces. All other vehicles compared had steel tops.

Concerning the Toyota Land Cruiser top, Challender testified that because of the method of construction when a force, such as was applied during the accident, hit the roof panel the roof would not tend to crumple, as in the case of a steel roof, but would simply blow up and out, either shearing or pulling the rivets through the roof. He further testified that a steel top can withstand greater force than fiber glass, particularly where there are reinforcing members across the roof to absorb the impact energy. The other vehicles compared, except the Chev Blazer, have steel tops with reenforcing structural members in the roof, whereas the Toyota Land Cruiser had no such reenforcement, only a mere fiber glass shell.

The testimony of Challender was corroborated by witness Donald J. Thiesen, a mechanic hired to repair the Land Cruiser. He noted that the upper structures were damaged severely; that the top panel was completely severed from the vehicle; that the sides were crushed from the roll; and that the rivets that attached the fiber glass top to the steel rail upon which the roof sat, were sheared and some pulled through and remained with the top. He further noted that the bolts used in the Land Cruiser, compared with American bolts, were softer and seemed to shear off easier.

- 12 -

considering this testimony in the light of the testimony of the eyewitness Bruce Leeson that "it turned over and hit the passenger side first, made a complete turn, and upon approaching a position in which you would refer to as upright the top came off of the vehicle as it was coming up to an upright position, and it flew up in the air. Silhouetted between the top and the vehicle were two bodies." and the deposition testimony of Mrs. Bundy, another eyewitness, "My distinct impression was that it looked so much like a child's toy car that was falling apart in the air, that the roof was coming off.", the jury could well have come to the conclusion that the roof and superstructure of the Land Cruiser was unreasonably dangerous. The top itself was submitted into evidence for the jury's inspection.

We find there was substantial evidence submitted to the jury for it to find that the Toyota Land Cruiser's defective design proximately contributed to the death of Brandenburger.

Issue 3. Whether there was an irregularity in the proceedings which prevented the manufacturer and distributer from having a fair trial when plaintiff and defendant Oltz settled the matter between themselves.

We find no merit to this contention. Appellants contend that during the course of trial a settlement was made between respondent and defendant Oltz, whereby there was an agreement that the sum of $50,000 would be paid to respondent on behalf of Oltz. Not so! An affidavit was filed by counsel for appellants to this effect in support of the motion for a new trial. Counsel for Oltz appeared and quite competently represented his client throughout the entire trial. In his brief and argument to this Court he set forth the fact that no settlement was reached during trial and that it was not until after the jury verdict that agreement was reached.

Judgment is affirmed.

_John Conway Harrison_
Justice

- 13 -

We concur:

_James T. Harrison_
Chief Justice

_Frank I. Haswell_

_Gene B. Daly_

-----------------------------------

Justices

Mr. Justice Wesley Castles dissenting:

I respectfully dissent. I do not disagree with the strict liability rule. What I disagree with is its application to a "second collision" situation such as here. The defect here under discussion was the defective top. It had nothing to do with the cause of the accident. If the vehicle had no top, as in a convertible, nothing would have changed as to the causation. I believe under Ford v. Rupple,/504 P.2d $\overline{\phantom{Mont.}}$ Mont.___, 686, 691, 29 St.Rep. 1081, this Court rejected the applicability of strict liability in "second collision" cases; that is where the initial accident is not caused by any breach of duty of a manufacturer; but it is contended, as here, that the damages are enhanced by some defect in construction or design.

I would reverse and grant a new trial.

_Wesley Castles_
Justice

- 15 -