No. 79-38

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

———————————

MADISON FORK RANCH,

Plaintiff and Respondent,

-vs-

L & B LODGE POLE TIMBER PRODUCTS,

Defendants and Appellants.

———————————

Appeal from:  District Court of the Eighteenth Judicial District,
In and for the County of Gallatin,
The Honorable W. W. Lessley, Judge presiding.

Counsel of Record:

For Appellant:

Bolinger, Higgins & Andes, Bozeman, Montana
H. A. Bolinger argued, Bozeman, Montana

For Respondent:

Berg, Morgan, Coil & Stckes, Bozeman, Montana
Gregory O. Morgan argued, Bozeman, Montana

———————————

Submitted:  JUN 2 0 1980

Decided:  AUG 2 5 1980

Filed:  AUG 2 5 1980

Thomas J. Keenan
——————————————————————
                                    Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

Plaintiff-respondent Madison Fork Ranch (Ranch) filed a complaint against defendants alleging a breach of contract in timber cutting operations on the Ranch and seeking rescission of the contract and an injunction. The District Court found a breach of contract and issued a permanent injunction prohibiting defendants from cutting any timber on the Ranch, but its findings, conclusions and judgment were silent on the issue of rescission of the contract. Defendant L & B Lodge Pole Timber Products appeals.

The Ranch is a dude ranch privately owned by a partnership of five nonresident individuals and is located near the town of West Yellowstone. The Ranch is operated purely for the leisure interests of its owners although it does accommodate some guests. It is not operated to return a profit. The partnership was formed in the early 1970's. At that time a fictitious name certificate was filed which listed the original partners. However, since that time, two original partners, Donald Dodge and John Tweedy, have purchased the interest of three of the other original partners. No other partnership ownership changes have occurred. A new fictitious name certificate was filed prior to trial but after commencement of the action.

The owners and Roland Bronder, the Ranch foreman, became concerned about Mountain Pine Beetle infestation of timber on the Ranch in early 1978. Bronder was authorized to hire a logger at that time. He contacted L & B Lodge Pole Timber Products through Robert H. Smith. L & B Lodge Pole Timber Products is owned and operated by Robert Smith and Lucille Smith and will be referred to as "Smith." The Ranch and Smith entered into an oral contract about June 1, 1978, and executed a written contract to log the property in August, 1978. Donald Dodge stated that the Ranch's purpose in entering into the oral contract was to

reduce the fire hazard as well as preserve the aesthetic and future economic value of the property. Dodge also testified that the contract was set at $10 per thousand, well below the market price, to allow Smith to profitably selective-cut the property. The Ranch's purpose in executing the written contract was to accommodate Smith in acquiring financing for logging equipment.

The logging operation commenced in late May, 1978, and continued through the summer with Bronder present most of the time. Bronder, in supervising the operation, advised Smith not to cut stands of fir or aspen and told him to leave other specific sections of trees and individual trees for their aesthetic value. Dodge testified that Smith was satisfactorily performing the contract by selective-cutting prior to the execution of the written contract.

In July, 1978, Smith discussed with Bronder the purchase of a "harvester" to complete the logging operation. A harvester is a large machine which is maneuvered through the woods felling individual trees and removing the limbs. Smith testified that Bronder thought the harvester was a good idea since he was concerned with the scars left by the caterpillar that Smith was using, and this problem would supposedly be eliminated by using the rubber-tired harvester. Bronder agreed to present the contract to the partners if Smith would have it drafted. Mr. Smith had his attorney draft the contract and it was signed by Smith and Margaret Grand, a partner in the Ranch, on August 1, 1978.

The logging operation changed considerably when Smith began using the harvester. The result was that many more trees were removed or knocked down after the written contract was drafted and signed. This effect is attributed to the character and size of the harvester.

The following contract provision is the center of controversy in this case:

"That the party of the first part agrees to sell

to the party of the second part all merchantable timber on said lands which has been or now is infected by the pine beetle, and the party of the second part agrees to cut and remove all of said merchantable timber from said lands on or before _____, 19__ . . ."

Smith testified that he understood the meaning of "infected merchantable timber" to mean all trees susceptible to infestation by the beetle since they would die eventually. He stated that the verbal agreement which predated the written agreement gave him this interpretation. Pursuant to this interpretation Smith believed he could take all trees which were seven inches in diameter or larger at chest height. Smith also testified that Bronder told him that he wanted the fire hazard removed entirely and the trees salvaged that could be salvaged. Smith said it was agreed that he would take all trees that would be hit by the beetles, although Bronder told him on several occasions not to take certain trees because of their aesthetic value.

As a consequence, Smith testified that he was selective-cutting down to seven inch chest high trees and leaving stands of fir and aspen. Bronder did not appear at trial.

On September 6, 1978, the Ranch notified Smith that they considered the contract terminated as a result of his failure to perform according to its terms. A complaint was filed September 11, 1978, and a temporary restraining order was issued on October 2, 1978. A show cause hearing was held and on October 10, 1978, the District Court "released and vacated" the temporary restraining order.

Smith re-entered the property about October 19, 1978, and logged 15 to 25 more acres before December 5, 1978. He was prevented from any further logging of the property in the spring of 1979, by Roland Bronder.

Smith's motions for dismissal and summary judgment based on the Ranch's failure to file a new fictitious name certificate were both denied.

The trial was held June 1, 1979. Several expert witnesses

testified as to their interpretation of the contract and the operation conducted by Smith. One of the experts, Robert McKnight, cruised the timber on the Ranch. McKnight has a B.S. degree in science and forestry with 13½ years experience with timber and forestry companies in southwestern Montana and 25 years experience in cruising timber. He determined that there was an average of 153 trees per acre consisting of 75 merchantable trees per acre, 43 were infected. He defined merchantable as eight inches in diameter at breast height. He also testified that most of the areas logged by Smith on the Ranch were clear-cut and that the market price for a clear-cut operation in the summer of 1978 was at least $50 per thousand. Dodge had also testified that after the execution of the written contract, the operation became a clear-cut operation.

William Driver, the timber sales and disease control specialist for the Gallatin and Custer Forest, testified, as did McKnight, that the contract was a selective-cut contract on a per tree basis.

The District Court entered findings of fact and conclusions of law on June 19, 1979. The court found, in pertinent part:

> " . . . That the purpose for which the plaintiff entered into this agreement was to reduce the fire hazard to the plaintiff's buildings and lands, along with the personnel residing thereon, as well as preserve the aesthetic and future economic values of the property from the pine beetle;

> "That the defendants have failed and refused to perform certain obligations under the contract in that they have cut trees which are not merchantable and have cut merchantable trees which are not infected or were not infected by the pine beetle; that the defendants, in their logging operations, have wasted and destroyed many of the young, green, noninfected trees standing on the property and will, unless otherwise restrained by this Court, continue to waste and destroy the young, green, uninfected trees standing on the property, which trees are of value to the plaintiff for aesthetic and economic purposes."

On the basis of the preceding findings, the District Court

concluded that Smith had breached the contract, and that since the destruction and the threatened future destruction to the standing timber could not be remedied by an action at law, an injunction was proper.

The judgment and permanent injunction was entered on June 28, 1979. The injunction perpetually enjoined Smith from entering the Ranch for the purpose of cutting or otherwise destroying any standing timber on the Ranch. The court also granted the Ranch a lien upon all timber cut but not decked on their land.

The following issues are raised on appeal:

1. Whether the defendant's acts in cutting uninfected merchantable trees and destroying young, green, uninfected (unmerchantable) trees constituted a breach of contract?

2. Whether the injunction is overbroad?

3. Whether the District Court erred in denying defendant's motions for dismissal and summary judgment which were based on plaintiff's failure to file a new fictitious name certificate prior to filing its complaint?

4. Whether the District Court erred in granting plaintiff a lien on the cut, undecked logs?

In addressing the breach of contract issue, we note that many legal distinctions have been drawn by courts as to the rights of the parties to a contract for the sale of timber. The distinctions are drawn depending on whether the instrument is a contract for sale or a conveyance of real property, whether the contract is oral or written, whether the contract is executed or executory, or whether a mere revocable license has been conveyed or title to the timber is passed. Depending on the circumstances, courts have treated timber agreements as either a contract for sale, a lease of the land, an employment contract, a license to cut timber or a conveyance passing title to the grantee. 54 C.J.S. Logs and Logging §9. To date, this Court has declared that an oral or simple contract for the sale of

timber is a mere license revocable at the will of the vendor. Sorensen v. Jacobson (1951), 125 Mont.148, 232 P.2d 332. In Gullicksen v. Shadoan (1950), 124 Mont. 56, 218 P.2d 714, we held that a written, unrecorded contract for the sale of timber was ineffective to bind a subsequent purchaser of the land who did not have notice. In dicta, it was stated that the presence or absence of notice was irrelevant since the contract was executory and would not prevent a unilateral revocation of the license. Pegg v. Mid-State Development Corp. (1974), 164 Mont. 525, 529 P.2d 1399, expressly overruled this dicta in Gullicksen in holding that a written contract for the sale of timber is enforceable against a subsequent purchaser with notice of the contract. However, the case is distinguishable from the present case in that the contract purported to convey title to all merchantable timber and no breach of contract was involved. No Montana cases have addressed the issue of breach of contract by harvesting timber which is not the proper subject of the contract.

Both parties treat the instrument as a contract for the sale of timber rather than a conveyance of an interest in land. We agree with this approach and proceed accordingly.

At trial appellant devoted much effort to showing that the best management practice to control the spread of the pine beetle is to remove all susceptible trees. He argues that this establishes a "usage of trade" which is to be given effect in construing the contract under the Uniform Commercial Code, section 30-2-208, MCA. However, section 30-2-107(1), MCA, establishes that a contract for the sale of timber is subject to the provisions of the UCC only if it is to be "severed by the seller". Thus, this contract is not subject to the provisions of the UCC and our construction of the agreement is dependent on common law construction rules. Any language in Pegg v. Mid-State Development Corp., supra, which infers that this contract is within the provisions of the UCC is overruled.

- 7 -

As we stated in Danielson v. Danielson (1977), 172 Mont. 55, 58, 560 P.2d 893, 894, "It is clear from Montana cases that where the language of a written contract is clear and unambiguous there is nothing for the court to construe; the duty of the court is simply to apply the language as written to the facts of the case, and decide the case accordingly." The appellant contends that an ambiguity is created in the contract by the use of the adjective "infected" since it can be construed to modify the word "lands" or to modify the word "timber." We cannot agree. The sentence in question states " . . . agrees to sell . . . all merchantable timber on said lands which has been or now is infected by the pine beetle. . ." Timber may be "infected by the pine beetle," however, the pine beetle does not strike and infect land. Thus, we find the language clear and unambiguous; respondent contracted to sell "all merchantable timber . . . which has been or now is infected by the pine beetle" and appellant contracted to "cut and remove all of said merchantable timber . . ." (Emphasis added.)

Since the language of the contract is clear and unambiguous, the trial court's duty was "simply to apply the language as written to the facts of the case, and decide the case accordingly." Danielson, supra. In so doing, the District Court found that appellant breached the contract by cutting trees which were not "merchantable" and merchantable trees which are not infected by the pine beetle.

With regard to the standard of review, this Court has repeatedly stated it will not overturn findings of fact and conclusions of law if supported by substantial evidence and by the law. When reviewing evidence it will be viewed in the light most favorable to the prevailing party. Luppold v. Lewis (1977), 172 Mont. 280, 284, 563 P.2d 538, 540-541, and cases cited therein. The record in the present case reveals that appellant freely admits that he is cutting all trees 7" or greater in diameter at chest height regardless of whether the individual

tree has been or is infected. There is also substantial testimony and photographic exhibits which establish that the harvester has destroyed many of the small, young, green trees which are not infected nor susceptible to the pine beetle. Two witnesses, an expert and Donald Dodge, also testified that at least 90 acres of the Ranch have been clear-cut. On the basis of these facts, when viewed in the light most favorable to the prevailing party, we find substantial evidence to support the District Court's findings of fact and conclusions of law.

Appellant also argues that the District Court's failure to specifically state that the defendant's cutting of young green trees and uninfected merchantable trees was unreasonable supports a conclusion of no breach of contract. In light of the evidence adduced including appellant's admissions and expert testimony that 90 acres was clear-cut, we find this contention without merit. The unreasonableness of appellant's conduct is necessarily implied in the District Court's findings and conclusion and is supported by substantial evidence. The trial court's judgment is presumed correct and this Court will draw every legitimate inference to support that presumption. Rule 52, M.R.Civ.P.; Havre Irrigation Co. v. Majerus (1957), 132 Mont. 410, 414, 318 P.2d 1076, 1078. On the record before us there is substantial evidence to support "unreasonableness" as well as a material breach of contract.

Appellant contends that the District Court erred in enjoining all cutting instead of merely enjoining the cutting of timber not included in the contract. It is argued that the appellant should be allowed to cut the merchantable infected timber on the Ranch even if a breach of contract is found. It is contended that this case falls within the rule that an injunction should be limited to enjoining the wrong and should not extend to preventing lawful activity under the contract. Kasala v. Kalispell Pee Wee Baseball League (1968), 151 Mont. 109, 439 P.2d 65, is cited as authority for this proposition.

- 9 -

We note two general principles of law related to injunctive relief. "An injunction is a writ framed according to the circumstances of the case commanding an act which the court regards as essential to justice, or restraining an act which it esteems contrary to equity and good conscience." 43 C.J.S. Injunctions §2. Ordinarily, injunctive relief is proper only if an act has been done or is threatened which will produce irreparable injury to the party asking for such relief, and acts which result in a serious change of, or are destructive to, the property affected either physically or in the character in which it has been held or enjoyed, do an irreparable injury. 43 C.J.S. Injunctions §28. It is also well-established that the granting of an injunction is a matter of discretion resting in the District Court and it will be sustained unless an abuse of discretion is shown. Erie and Mulvihill v. State Hwy. Comm'n (1969), 154 Mont. 150, 461 P.2d 207.

The District Court concluded that an injunction was proper after finding that "the standing timber is part of the real property, the destruction of which or the threatened destruction of which, cannot be remedied by an action at law." In reaching this conclusion the court considered the character and use of the property as well as the conduct of the appellant. The District Court found instrumental the fact that the property's principal value over the last one hundred year period has been "recreational, aesthetic and environmental." The court also stated that "the period necessary to mature lodge pole pine is in excess of sixty (60) years." The threatened future harm is demonstrated by Smith re-entering the land to cut 15 to 25 additional acres after being notified that the Ranch considered him in breach and the contract terminated. Under these facts we do not find an abuse of discretion. Neither do we find the injunction overbroad. On the basis of appellant's conduct in re-entering the land after a notification of termination, the District Court was warranted in enjoining all future cutting to prevent future

irreparable injury to the Ranch.

Appellant strenuously argues on appeal that rescission is not appropriate in this case under section 28-2-1711, MCA. The trial court concluded that the destruction or threatened destruction to the timber cannot be "remedied by an action at law." Although courts have found rescission at law (as distinguished from rescission in equity) to be an appropriate remedy when confronted by a material breach of a timber sales contract, see Crofoot Lumber v. Thompson (1958), 163 Cal.App.2d 324, 329 P.2d 302, the area is far from well-settled and has not been addressed by this Court. However we need not address this issue in the present appeal since the District Court will not be reversed on appeal for accepting the appealing parties legal theories at trial.

Appellant next contends that the District Court erred in denying its motions to dismiss and for summary judgment which were based on Montana's fictitious name statutes. Although the 1979 legislature repealed the fictitious name provisions, the following statutes, appearing in section 63-601, R.C.M. 1947 through section 63-603, R.C.M., 1947, were in effect throughout the lower court proceedings:

> "63-601. Fictitious name. Every partnership, other than a limited partnership, transacting business in this state under a fictitious name, or a designation not showing the names of the persons interested as partners in such business, must file with the clerk of the county in which its principal place of business is situated, a certificate, stating the names in full of all the members of such partnership and their places of residence, and publish the same once a week, for four successive weeks, in a newspaper published in the county, if there be one, and if there be none in such county, then in a newspaper published in an adjoining county.

> "63-602. Certificate--when to be filed. The certificate filed with the clerk, as provided in the preceding section, must be signed by the partners, and acknowledged before some officer authorized to take acknowledgment of conveyances of real property. Where the partnership is hereafter formed, the certificate must be filed and the publication designated in that section must be made within one month after the for- mation of the partnership, or within one month from the time designated in the agreement of its

members for the commencement of the partnership; where the partnership has been heretofore formed, the certificate must be filed and the publication made within six months after the passage of this code. _Persons doing business as partners contrary to the provisions of this chapter, or any assigns thereof, shall not maintain any action upon or on account of any contracts made or transactions had in their partnership name, in any court of this state, until they have first filed the certificate and made the publication herein required._ (Emphasis added.)

"63-603. _Change of membership--filing new certificate._ On every change of the members of a partnership, other than a limited partnership, transacting business in this state under a fictitious name, or a designation which does not show the names of the persons interested as partners in its business, a new certificate must be filed with the county clerk, and a new publication made, as required by this chapter, on the formation of such partnership."

The Madison Fork Ranch complied with the provisions of the preceding statute in 1973 when the partnership was formed. However, prior to the commencement of this action two original partners purchased the interests of three other original partners. A new certificate was not filed prior to this suit. The appellant's motions to dismiss and for summary judgment based on noncompliance with these provisions were both denied and the respondent was granted a continuance to comply with the provisions. The new certificate was filed approximately one month prior to trial.

The critical language in the statutes is " . . . shall not maintain any action . . . until they have first filed the certificate and made the publication herein required" in section 63-602, R.C.M. 1947. The cases construing this language have distinguished between "maintain" and "commence." In Reilly v. Hatheway (1912), 46 Mont. 1, 11, 125 P. 417, this Court construed this section's predecessor as follows:

"Without deciding whether the statutory provisions heretofore referred to apply to the plaintiff, it is sufficient to hold, on the authority of Carson-Rand Co. v. Stern, 129 Mo. 381, 32 L.R.A. 420, 31 S.W. 772, and Nicholson v. Auburn Gold Min. & M. Co., 6 Cal.App. 547, 92 P. 651, _that it is not the right to begin an action, but the right to maintain it, that is withheld by the statute for failure to comply_

with _its terms;_ and if, before the defense is interposed, the plaintiff complies with the statutory provisions, the action may be maintained. The defense is an affirmative one and is waived unless pleaded in the answer. (Vaughan v. Kujath, 44 Mont. 484, 120 P. 1121; California S. & L. Society v. Harris, 111 Cal. 133, 43 P. 525.) The appellant alleged that he had complied with the statute, and, while this allegation was not necessary in order to state a cause of action, it was, nevertheless, denied, and we think the denial was sufficient to raise the issue. But so long as the statute was complied with by the appellant before the answer was interposed, the action should not abate. The _right to maintain the action is simply suspended until the statute is complied with._" (Emphasis added.)

In Croft v. Bain (1914), 49 Mont. 484, 489, 143 P. 960, we said:

"The disability imposed by section 5505 for failure to comply with the requirement of section 5504 cannot be of avail to the defendant except upon affirmative allegation and proof. It is in the nature of matter in abatement. (Reilly v. Hatheway, 46 Mont. 1, 125 P. 417; California Sav. & L. Soc. v. Harris, 111 Cal. 133, 43 P. 525.) The inhibition does not destroy the right of action upon which recovery is sought, but merely imposes a disability to _maintain the action thereon until the requirement of section 5504 has been complied with._" (Emphasis added.)

In construing the same restriction "to maintain" an action for noncompliance with the California fictitious name statutes, a California Court stated:

"An objection to the maintenance of an action on the ground that plaintiff has not complied with the provisions of sections 2466 and 2468 of the Civil Code by filing and publishing the certificate required thereby, is a mere matter of abatement pending the trial, which has the result of suspending the trial until the statute is complied with. It is not jurisdictional. Bryant v. Wellbanks, 88 Cal.App. 144, 150, 263 P. 332; California Savings & Loan Soc. v. Harris, 111 Cal. 133, 136, 43 P. 525; Ontario State Bank v. Tibbits, 80 Cal. 68, 22 P. 66, 1 C.J.S., Abatement and Revival, §91, p. 129. In the authority last cited it is said:

"'The failure of an individual or partnership plaintiff, doing business under an assumed, fictitious, or representative name, to comply with an applicable statute requiring the filing of a prescribed affidavit or certificate, is merely a matter in abatement, until the statute is complied with.'

"In the Bryant case, supra [88 Cal.App. 144, 150, 263 P. 335], it is said that it is a sufficient compliance with section 2468 of the Civil Code if the certificate is filed and

- 13 -

published 'at any time before trial.' The statute in question does not prohibit the instituting or commencement of an action for failure to file the certificate. It merely forbids the <u>maintenance</u> of the action 'until the certificate has been filed and the publication has been made.' Before an action is finally dismissed on that ground, prior to the trial the plaintiff should be given an opportunity to comply with the statute if it so desires." Kadota Fig Ass'n v. Case-Swayne Co. (1946), 73 Cal.App.2d 796, 167 P.2d 518, 523.

We agree with the distinction drawn between "maintenance" and "commencement" in the previously cited authority. The District Court was not in error in allowing plaintiff to comply with the fictitious name provisions prior to trial.

Appellant's final contention is that there is no legal authority to support the granting of the lien on the cut undecked logs. The respondent contends that the lien granted is an equitable lien and is appropriate in this case.

The factual basis for the lien granted is Smith's alleged failure to dispose of slash pursuant to the contract and the economic damage caused to the property as a result of the cutting operation. As a result of appellant's allegedly not complying with the slash removal provision, the Ranch will incure expense in obtaining another to remove the slash. The slash removal clause provides that Smith agrees to pile and dispose of the slash in such manner as to be satisfactory to the State of Montana. Evidence adduced at trial concerning slash disposal included testimony from an inspector for the State Division of Forestry, Curtis Tesmer. Tesmer testified that Smith was in compliance with the slash reduction agreement with a few exceptions in September, 1978 (prior to Smith's re-entry to cut 15 to 25 more acres in October, 1978). Dodge also testified that the Ranch would incur substantial cost in removing slash not disposed of by Smith. No evidence was submitted on the amount of economic damage suffered by the Ranch as a result of Smith's breach in cutting trees not conveyed in the contract, in the alleged failure to dispose of slash or in the value of trees cut and not decked. In addition, the respondent's pleadings make no

mention of a claim for a lien.

The respondent cites American Equitable Assurance Co. v. Newman (1957), 132 Mont. 63, 313 P.2d 1023, and Sorensen v. Jacobson, supra, as authority for the granting of this equitable lien. We find neither case relevant to the present appeal; Newman involved subrogation and Sorensen involved a purchase money lien. A lien is merely a charge or encumbrance on property which subjects the property to the payment of a claim or debt. The issue of damages was never raised, no evidence was adduced on the amount of damages and the District Court failed to state the amount of the lien granted. Although we recognize that an equitable lien may be granted under a great variety of circumstances, including breach of contract, there is no basis for such a lien where, as here, there is no ascertained debt or claim.

The judgment is modified by vacating the lien provisions and, as modified, the judgment is affirmed, costs to respondent.

_____
Chief Justice

We concur:

_____

_____
Justices

- 15 -

Mr. Justice John C. Sheehy concurs in part and dissents in part.

I concur with the rest of the foregoing opinion, but I dissent from that part vacating the equitable lien created by the District Court.

The majority is in error when it determines that there is no claim or debt here to which an equitable lien may reach.

It is inconsistent to hold on the one hand that Madison Fork Ranch is entitled to an injunction because Smith indiscriminately cut logs by clear-cutting irrespective of whether the trees were infected by the pine beetle, and on the other hand, to deny an equitable lien where the felled logs are wrongfully appropriated by Smith. The doctrine of equitable liens is not limited merely to property which is subject to the payment of a claim or debt. The power of a District Court to grant an equitable lien is as broad as the reach of equity itself, out of considerations of right and justice, to protect for the rightful owner property unlawfully appropriated.

> "An equitable lien may arise independently of any express agreement; it may arise by implication from the conduct and dealings of the parties. As the rule is frequently stated, in the absence of an express contract, an equitable lien, based on those maxims which lie at the foundation of equity jurisprudence, may arise by implication out of general considerations of right and justice, where, as applied to the relations of the parties and the circumstances of their dealings, there is some obligation or duty to be enforced. However, the tendency is to limit rather than extend the doctrine of constructive liens, and, in order that such a lien may be claimed, either the aid of a court of equity must be requisite to the owner so that he can be compelled to do equity or there must be some element of fraud in the matter as a ground of equitable relief. Such a lien will not be implied and enforced where the facts and circumstances present no grounds for equitable relief, and there is an adequate remedy at law, as where the parties themselves have stipulated for a purely legal liability . . .

-16-

". . . If a court of equity can trace money or property unlawfully obtained or appropriated into any other shape, it will intervene to secure it for the owner, by holding it to be his or by giving him a lien on it; but such a lien cannot be enforced on other property which has not been enhanced or augmented by the unlawful appropriation . . ." 53 C.J.S. 844, 845, Liens, §4(1). (Emphasis added.)

As to those logs which were rightfully cut by Smith, that is those trees which were infested by the mountain pine beetle, such trees became the property of Smith under the terms of this agreement immediately upon severance thereof. As to those trees which were wrongfully felled by Smith, those that were not so infected, there was an unlawful appropriation. Those lawfully appropriated and those unlawfully appropriated now appear to be in a single mass, unidentifiable perhaps, and the situation is one ripe for the equitable power of the District Court to protect the property of Madison Fork Ranch. In Krusen Land & Timber Co. v. Tampa Suburban Corp. (Fl. 1935), 158 So. 712, where the lumber company received lumber belonging to others and knowingly sawed and commingled it with its own in an unidentifiable mass, the lumber company was a trustee ex maleficio and an equitable lien could be enforced against the whole mass of lumber.

The Court in granting injunctive relief was sitting in equity. A court sitting in equity has all power requisite to render justice between the parties, particularly if the intent and disposition of one party is not to perform its contractual obligations. Link v. State By & Through Dept. of Fish & Game (1979), ___ Mont. ____, 591 P.2d 214, 36 St.Rep. 355.

The majority has hobbled the equity court unnecessarily in preventing it from giving complete equitable relief.

I would affirm in toto.

_____
Justice

_____
Justice