No. 79-68

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

HAROLD POULSEN, KARL INGEBRIGHTON,
DICK OLSON and EMERY MATSKO, JR.,

Plaintiff and Respondent,

vs.

TREASURE STATE INDUSTRIES, INC.,
A Montana Corporation; and
KENNETH K. KNIGHT,

Defendant and Appellant.

Appeal from:   District Court of the Eighth Judicial District,
               In and for the County of Cascade.
               Honorable Joel G. Roth, Judge presiding.

Counsel of Record:

    For Appellant:

        Robert Emmons argued, Great Falls, Montana
        Graybill, Ostrem, Warner and Crotty, Great Falls,
         Montana
        Donald Ostrem argued, Great Falls, Montana

    For Respondent:

        Cure and Borer, Great Falls, Montana
        Edward W. Borer argued, Great Falls, Montana

                            Submitted:  January 16, 1981

                            Decided:  FEB 18 1981

Filed: FEB 18 1981

Thomas J. Kearney
                        Clerk

Mr. Justice Gene B. Daly delivered the Opinion of the Court.

Plaintiffs brought this action in the District Court of the Eighth Judicial District of the State of Montana, in and for the County of Cascade, against Treasure State Industries (TSI) and its former president, Kenneth Knight, claiming defendants were guilty of fraud in the execution of a contract for deed. Defendant TSI filed a cross-claim against Knight, seeking indemnity, and Knight also cross-claimed against TSI. Following a trial to the court sitting without a jury, the trial court entered judgment in favor of plaintiffs in the amount of $302,129.65, adjudged TSI entitled to indemnity from Knight, and denied Knight's cross-claim. Defendants appeal.

On August 19, 1974, defendants sold to plaintiffs a shale and concrete block plant, located north of Great Falls, Montana, along with supporting equipment. This case involves the negotiations, representations and inspections which took place prior to the sale.

It is undisputed that the subject shale and block plant had been for sale at least since early 1972. Robert Mager was at all times during the sequence of events leading up to the execution of the contract for deed the plant manager of defendant TSI and was designated as the promoter of the sale in charge of showing prospective purchasers around the plant. In the early spring of 1974, plaintiffs Ingebrigtson, Olson and Poulsen became interested in the plant and decided to investigate the purchase of the TSI plant.

During the course of inspecting the shale plant, plaintiffs noticed scaffolding around the stack of the rotary

-2-

kiln. It is the representations made regarding the scaffolding which present the main bone of contention.

Plaintiffs testified they asked Mager the reason for the scaffolding and were advised that the Board of Health had requested the stack be extended to take care of a pollution problem. Mager was further asked if this solved the air pollution problems to which he replied that it had. Plaintiffs also testified that approximately one month before the deal became final, they advised Knight that Mager had told them that the scaffolding had been used to extend the stack to alleviate an air pollution problem. Knight was asked if the pollution problem was cured, and he confirmed that it was.

Mager and Knight testified that the scaffolding had been discussed but contend they simply told plaintiffs that TSI had made alterations as requested by the air pollution people and that Mager said he thought, and Knight concurred, that it (TSI) might have satisfied the Board of Health because it had not heard from the Board for some time.

Negotiations between plaintiffs and TSI were concluded in the summer of 1974 and on August 19, 1974, the parties entered into a contract for deed for the purchase of the shale and block plant.

In September 1974, plaintiff Ingebrigtson was informed by the director of the Cascade County Air Pollution Control Program, Sam Kalafat, that the emissions from the stack of the rotary kiln were substantially in excess of that permitted by the air pollution program, that notice of violation would be forthcoming, and that, if corrective action was not taken, the shale plant could not be operated.

-3-

On March 5, 1975, an official notice of violation and order to take corrective action to repair the aggregate dryer stack (rotary kiln) was received.

Plaintiffs were successful in obtaining a variance to operate the plant enabling them to investigate the problem and determine what corrective action might be taken. A study was undertaken which revealed that installation of a bag house at a cost of approximately $60,000 would eliminate the violation. Plaintiffs subsequently applied for and received a permit for construction of the bag house on January 9, 1976. Included in the letter approving the permit was a request to alleviate pollution from five other areas of the plant. Rather than construct the bag house and alleviate only part of the problem, plaintiffs hired engineer Charles Lush to prepare a study of the possible solutions and costs to remedy the pollution. According to Lush's report the cost of bringing the plant into compliance with regulations would be $279,871. Plaintiffs failed to obtain an extension on their variance, and the plant stopped operation sometime thereafter. This suit followed.

In addition to the air pollution problem, in the spring of the year water from the plant would drain into the adjacent land of Robert Ballard, depositing shale particles and adversely affecting productivity. Under threat of a lawsuit, plaintiffs built a diversion dam at a cost of $19,028 to remedy the problem. Plaintiffs allege that defendants' failure to disclose the drainage problem was constructive fraud and that they are entitled to the amount expended to construct the dam.

The issues presented on appeal are:

1. Whether the trial court erred in determining that in negotiating the contract for deed Treasure State Industries, Inc., and Kenneth K. Knight were guilty of actual fraud or in the alternative constructive fraud with regard to the alleged air pollution problems?

2. Whether the trial court erred in determining the defendants were guilty of constructive fraud in failing to reveal an alleged problem with regard to water drainage?

3. Whether the trial court erred in its determination that defendant Kenneth K. Knight should be required to indemnify defendant Treasure State Industries, Inc., for all damages awarded to plaintiffs against defendants?

4. Whether the trial court erred in its determination of damages by application of an incorrect measure of damages?

Defendants contend there is insubstantial evidence to support a finding of either actual or constructive fraud in the contract negotiations. On appeal, our function is to determine whether there is substantial evidence to support the findings of the trial court. This Court will not reverse the findings of the trial court unless there is no substantial evidence to support such findings.

In Lee v. Stockmen's Nat. Bank (1922), 63 Mont. 262, 284, 207 P. 623, this Court set down the elements which a plaintiff must prove to make out a prima facie case of actual fraud: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7)

his reliance upon its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.

Actual fraud is always a question of fact. Section 28-2-404, MCA. Fraud can never be presumed but must be proved by a preponderance of the evidence. Good faith will always be presumed and mere suspicion of fraud is not sufficient. Reilly v. Maw (1965), 146 Mont. 145, 153, 405 P.2d 440, 442.

The alleged actual fraud upon which the District Court made its finding that plaintiffs were entitled to damages was the representations made by Robert Mager and Kenneth Knight that the extension of the rotary kiln stack had satisfactorily remedied the air pollution problem. Although the District Court's findings do not specifically set forth each element of actual fraud, a review of the record indicates evidence to support a finding of fraud and susequent damages.

Plaintiffs Poulsen, Ingebrigtson and Olson testified that in the course of inspecting the shale plant Robert Mager, the plant manager, stated that the stack extension on the rotary kiln had remedied the air pollution problem. Also, on June 28, 1974, TSI's former president, Kenneth Knight, told plaintiffs the information given them by Mager was correct. Of course, the testimony of Mager and Knight is slightly different in that they testified they thought the repairs satisfied the pollution people and informed plaintiffs only to that extent.

As evidenced by the "Notice of Violation and Order to Take Corrective Action" dated March 5, 1975, the emissions from the aggregate dryer stack (rotary kiln) were in

-6-

violation of state and county pollution regulations and the extension put thereon did not in fact remedy the pollution problem. Furthermore, in response to a question regarding TSI's attempts to alleviate the pollution problem, Sam Kalafat, the director of Environmental Health Services for the City-County Health Department, stated: "The efforts by Treasure State Industries were totally unapproved by our agency. We advised them that before they proceed, that necessary applications and permits be filed. And I think the record speaks for itself that they were not. And I feel that the efforts were not really substantial, no."

In light of the nonoperative condition of the shale plant due to pollution violations and the cost of bringing the plant into compliance with regulations, it is beyond serious argument that the representations made by defendants to plaintiffs were material to the contract.

On May 23, 1972, TSI received a "Notice of Violation and Order to Take Corrective Action" to alleviate the pollution problems caused by the aggregate dryer and dust collector.

On April 16, 1973, defendant Knight received a letter from the Cascade County Air Pollution Control Program advising him that the plant was not in compliance with the state and county regulations and that certain steps needed to be taken before operations could resume.

On April 19, 1973, Dan Lincoln and Cleve E. Johnson, employees of the county pollution program, visited the plant and discussed its dust problems with Robert Mager. The areas discussed were the hammermill, elevators, spray tower, and storage and truck loading facilities.

Finally, from March 1974 until the time of sale, the TSI

office manager and cost accountant, Cherrie Anthony, over-
heard numerous conversations between TSI plant managers, Bob
Mager, Al Gehrke, Mr. Forzley and Glen Mortenson, regarding
the pollution problem and possible solutions. At trial she
was asked the substance of conversations she had with
Forzley and Mortenson regarding the pollution problem and
answered:

> "We were told that we were just going to shelve the
> problem. I was told that's what they were going to
> do, was just shelve the problem. We were in the
> process of trying to sell the plant. There had
> been several buyers interested. Super-Lite [the
> plaintiffs] was one of them, and that for the
> current time there were more important things to
> worry about than the problems at the shale plant."

The circumstances surrounding the negotiations and sale
of the plant are sufficient to show that Mager and Knight
intended their representations be relied and acted upon to
consummate the sale. See Cowan v. Westland Realty Co.
(1973), 162 Mont. 379, 512 P.2d 714; Lee v. Stockmen's Nat.
Bank (1922), 63 Mont. 262, 207 P. 623; Dunlap v. Nelson
(1974), 165 Mont. 291, 529 P.2d 1394. The fact that from
the moment of its procurement the plant was for sale
indicates TSI purchased the plant for investment purposes.
One of Mager's primary duties as plant manager was to
promote the sale and secure a willing purchaser. It is
fundamental that a plant in compliance with pollution
control regulations is more saleable than one in need of
substantial pollution control devices.

Defendants contend that plaintiffs were knowledgeable
businessmen and should have known the plant had pollution
problems. This argument is not only an admission but is
also without merit when one takes into consideration the
highly technical field of environmental science. At no time

-8-

prior to the notice of violation on March 5, 1975, did plaintiffs believe the plant was not in compliance with pollution regulations.

One of defendants' principal allegations is that plaintiffs had no right to rely, and in fact did not rely, upon the alleged misrepresentations. The basis for this contention is the absence of any finding of fact by the District Court regarding reliance. Defendants argue the reliance is an essential element of fraud and in the absence of a specific finding on that element, there is a fatal failure of proof.

In concluding that defendants committed fraud, the District Court specifically made findings as to the elements of a representation, its falsity, its materiality, the speaker's knowledge of its falsity, his intent that it be acted upon, the hearer's ignorance and the consequent injury. Defendants argue that the District Court's failure to make a specific finding as to reliance is sufficient grounds for reversal. We do not agree.

On review, the trial court's judgment is presumed correct, and this Court will draw every legitimate inference to support that presumption. Rule 52, M.R.Civ.P.; Havre Irrigation Co. v. Majerus (1957), 132 Mont. 410, 414, 318 P.2d 1076, 1078; Madison Fork Ranch v. L & B Lodge Pole Timber Products (1980), ____ Mont. ____, 615 P.2d 900, 37 St.Rep. 1468. The Supreme Court adheres to the doctrine of implied findings which states that where a court's findings are general in terms, any findings not specifically made, but necessary to the judgment, are deemed to have been implied, if supported by the evidence. Ballenger v. Tillman

(1958), 133 Mont. 369, 324 P.2d 1045. In support of the trial court, this Court will engage in the doctrine of implied findings so long as those findings are not inconsistent with express findings made. Crissy v. State Highway Commission (1966), 147 Mont. 374, 413 P.2d 308.

The Supreme Court of the State of California inferred an intent to deceive in the fraud case of Boas v. Bank of America Nat. Trust & Savings Ass'n (1942), 51 Cal. App. 2d 592, 125 P.2d 620. In that case the court stated:

"On appeal a reviewing court is entitled to draw necessary inferences from the trial court's express findings in order to support a judgment [citations omitted]; that is to say, where from the facts found and the judgment ordered it is evident in the light of the entire record that if more complete findings had been made they would have been adverse to the contention of the appellant, it will be deemed that such inference has been drawn by a trial court, and in those circumstances the failure so to find is not a ground for the reversal of the judgment. [Citations omitted.] Here fraud was charged; one of the legal grounds upon which the trial court founded its judgment that the agreement was void was that it was obtained by false pretenses; and the evidence shows and the trial court expressly found that the false representations were at all times known to the plaintiff to be false. It follows necessarily that if the trial court had made a finding covering the element of intent to deceive the finding would have been adverse to appellants. Therefore, the absence of a specific finding to that effect does not serve as grounds for reversal.

". . . The issue of fraud constituted one of the principal issues the trial court was called upon to decide, and a great deal of evidence was introduced on that issue. It must be assumed, therefore, that if the trial court did not believe that appellants made the false representations with intent to deceive it would have so found. As said in Phillips v. Hooper, 43 Cal.App.2d 467, 111 P.2d 22, the findings of fact must be taken as embodying the conclusions of the trial court on all questions of fact submitted to it for decision; and no antecedent expressions of the trial judge can in any way restrict his power to declare his final conclusion in the only manner authorized by law, that is, by filing his decision containing his findings of fact and conclusions of law as provided in sections 632 and 633 of the Code of Civil Procedure (citing several cases)." 125 P.2d at 623-624.

-10-

Reliance has been defined as a belief which motivates an act. Martin v. Kennell (1969), 169 Colo. 122, 453 P.2d 797. An inference of reliance upon fraudulent representations may be drawn from circumstances surrounding the transaction which have been proven. Peine v. Murphy (1962), 46 Haw. 233, 377 P.2d 708; Hunter v. McKenzie (Cal. 1925), 239 P. 1090; Davis v. Re-Frac Manufacturing Corporation (1967), 276 Minn. 116, 149 N.W.2d 37. Although circumstantial evidence may be used to draw an inference of reliance, plaintiff is not confined to circumstantial proof or presumption of reliance but may testify as to whether he relied upon the false representation or concealment of defendant. Peskin v. Squires (1957), 156 Cal.App.2d 240, 319 P.2d 405. The following testimony was given at trial:

"Q. Mr. Olson, would you have bought the shale and block plant had you known of the air pollution problems with the shale plant, and that you would be unable to operate the shale plant? A. Definitely, I would not have been involved."

"Q. [To Poulsen] Did you rely on the representations that the plant was in compliance with air pollution regulations when you purchased the plant? A. Yes.

"Q. Were those representations, the representations that I'm referring to are those made by Bob Mager and by Ken Knight? A. Those representations were made by Bob Mager when we were visiting the shale plant, and by Kenneth Knight in his office in the Holiday Village.

"Q. And those were the representations that you relied upon. A. Yes, very definitely."

Direct evidence supports a finding of reliance. We engage the doctrine of "implied findings" and hold the trial court found reliance. We affirm the holding of actual fraud.

The District Court also made an alternative ruling that

-11-

defendants were guilty of constructive fraud with regard to other air pollution problems at the plant and the water drainage problem.

> "Constructive fraud consists in:

> "(1) any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault or anyone claiming under him by misleading another to his prejudice or to the prejudice of anyone claiming under him . . ." Section 28-2-406, MCA.

Russell v. Russell (1969), 152 Mont. 461, 452 P.2d 77, is squarely in point on a factual situation very analogous to the instant case. Russell was an action for the recovery of money paid for an option to purchase property based on fraud. The property involved was a bar and cafe. Prior to the plaintiff's paying consideration for an option to purchase, the premises had been examined by the county sanitarian and a State Department of Health inspector. They found that the sewage disposal system was inadequate and warned the owner that the violation of health regulations was serious and should be corrected and, if it were not, a license to continue operating the business would not be issued in the coming year.

The owner did not disclose the sewage problem or the warning from the Board of Health to the prospective purchaser. The purchaser was later warned by the Board that, if he did not make the necessary corrections, the license to operate the bar and cafe would not be renewed. The purchaser then brought suit to rescind the contract and recover the option money.

The jury found in favor of the plaintiff. On appeal, the defendant made the same argument as defendants in the case at bar--that is, that the plaintiff's evidence and

proof had failed to establish the nine elements of actual fraud hereinabove set forth. In rejecting that contention, this Court said:

> "We do not think the instant case was one of actual fraud so that the above nine elements would apply. We think, instead, it was a concealment, more in the nature of constructive fraud.
>
> "Section 13-309, R.C.M. 1947, states:
>
> "'Constructive fraud consists: . . . (2) In any such act or omission as the law especially declares to be fraudulent without respect to actual fraud.'
>
> "We think it was a fraudulent act on the part of the appellant to withhold information on the warning she had received from the State Board of Health.
>
> "'. . . fraud is complete where a vendor <u>knowingly</u> <u>suppresses</u> a serious vice of his property which the vendee had no reason to suspect.' [Citations omitted.]" 152 Mont. at 465-466.

The notice of violation dated May 23, 1972, sent to TSI and the letter dated April 6, 1973, sent to Knight clearly indicate defendants had knowledge of pollution violations at the shale plant including the hammermill, elevators, spray tower and storage and truck loading facilities. Furthermore, defendants were aware of the water drainage problem, as evidenced by neighbor Ballard's testimony. The record is void of any attempt by defendants to disclose this information to plaintiffs. These violations were serious impairments to the property which plaintiffs had no reason to suspect. We find there is substantial evidence to support a finding of constructive fraud.

In determining TSI's right to indemnification from Knight, we must ascertain the basis upon which liability was imposed.

The general rule is that a principal is responsible for the injuries resulting from fraud of his agent, committed

during the existence of the agency and within the scope of
the agent's actual or apparent authority.  Gleason v.
Seaboard Air Line R. Co. (1929), 278 U.S. 349, 49 S.Ct. 161,
73 L.Ed. ~~915~~ *4/5*; Grant v. Weatherholt (1954), 123 Cal.2d 34,
266 P.2d 185.  This rule is fully applicable to corporations
in that a corporation is a principal which can be liable for
fraud only through conduct of its agents.  Thomas v.
Duralite Company, Inc. (D. N.J. 1974), 386 F.Supp. 698.

It is undisputed that at all times pertinent, Robert
Mager was acting within the course and scope of his employ-
ment with TSI.  In accordance with the aforementioned rule,
TSI, as principal, is liable for the fraudulent representa-
tions and concealments of its agent Robert Mager.

The District Court found, and we agree, that at all
times pertinent to this litigation, Kenneth Knight was
president of TSI and was acting within the scope and course
of his employment with the corporation.  It is clearly
established that a director or officer of a corporation is
individually liable for fraudulent acts or false repre-
sentations of his own or in which he participates even
though his action in such respect may be in furtherance of
the corporation's business.  Tyler v. Savage (1892), 143
U.S. 79, 12 S.Ct. 340, 36 L.Ed. 82; Hoffman v. Toft (1914),
70 Or. 488, 142 P. 365.  This personal liability attaches
regardless of whether liability also attaches to the
corporation.  United States Liabil. Ins. Co. v. Haidinger-
Hayes, Inc. (1970), 83 Cal.Rptr. 418, 463 P.2d 770.

Defendants' liability is joint and several.  TSI's
liability is based on its principal agent relationship with
its manager Mager, whereas Knight's liability is based on

-14-

his fraudulent misrepresentations and concealment of
material facts.

The right to indemnity is an equitable principle, based
on the general theory that one compelled to pay for damages
caused by another should be able to seek recovery from that
party. May Trucking Co. v. International Harvester (Idaho
1975), 543 P.2d 1159; see also DeShaw v. Johnson (1970), 155
Mont. 355, 472 P.2d 298. "As a general rule one compelled
to pay damages for the negligent or tortious act of another
is not entitled to indemnity from the latter where both
parties are joint tortfeasors or in pari dilecto." 42
C.J.S. Indemnity, § 27 at 240. This rule was adopted in
Great Northern Railway Company v. United States (D. Mont.
1960), 187 F.Supp. 690, 693; Fletcher v. City of Helena
(1973), 163 Mont. 337, 517 P.2d 365, 369.

The court found defendants in pari dilecto. In the
absence of a finding of fact which determines the actions of
Knight to have totally caused plaintiffs' injury, TSI's
right to indemnification must be vacated.

In the sale of commercial property, a commercial
standard of damages should be applied. Plaintiffs are
entitled to the benefit of their bargain--that is, the
benefit which defendants promised to deliver. See Moore v.
Swanson (1976), 171 Mont. 160, 556 P.2d 1249. Defendants
promised to deliver an operative shale plant. The code
violations rendered the plant inoperative. Therefore,
plaintiffs are entitled to damages in the amount which will
bring the plant into compliance.

In the absence of substantial evidence to support a
finding of fraud in relation to the the water flowing onto

the Ballard property, however, there is no basis on which to award damages for the construction of the diversion dam by plaintiffs.

We affirm the District Court judgment holding defendants jointly and severally liable for actual and constructive fraud and vacate the judgment for indemnification and the damages for the diversion dam.

_____
Justice

We concur:

_____
Chief Justice

_____
Justices

-16-