No. 98-491

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 186

295 Mont. 318

983 P.2d 943

JESSE DURDEN and GRACE ANN DURDEN, individually and as Guardians for

APRIL DURDEN, a Minor,

Plaintiffs,

v.

HYDRO FLAME CORPORATION, a Utah Corporation,

Defendant, Cross-Defendant, and Respondent,

and

CHIEF INDUSTRIES, INC.,

APPEAL FROM: District Court of the Sixth Judicial District, In and for the County of Park,

The Honorable John Warner, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Gig A. Tollefson, Berg, Lilly, Andriolo & Tollefsen, P.C.; Bozeman, Montana

For Respondent:

(Argued) Barry G. O'Connell, Moore, O'Connell & Refling, P.C.; Bozeman, Montana

Richard D. Burbidge, Burbidge & Mitchell; Salt Lake City, Utah

Monte D. Beck, Beck & Richardson; Bozeman, Montana

Joe Bottomly, Attorney at Law; Kalispell, Montana

For Amicus:

No

Stephen C. Pohl, Attorney at Law; Bozeman, Montana (MTLA)

Argued and Submitted: April 20, 1999

Filed: Decided: August 3, 1999

_____

Clerk

Justice Jim Regnier delivered the opinion of the Court.

**¶1. The Durdens filed this action against Chief Industries, Incorporated and Hydro Flame Corporation in the Sixth Judicial District Court, Park County, to recover damages for injuries sustained while inhabiting a fifth-wheel trailer manufactured and sold by Chief Industries and heated by a furnace manufactured by Hydro Flame. Chief Industries and Hydro Flame filed cross-claims against each other seeking indemnification from the other in the instance either was found liable. Prior to trial the Durdens and Hydro Flame reached a court-approved settlement and the District Court dismissed both cross-claims with prejudice. Following a trial between the Durdens and Chief Industries, an appeal resulting in *Durden v. Hydro Flame Corporation*, 1998 MT 47, 955 P.2d 160, and remand, Chief Industries sought to have its indemnity cross-claim reinstated. The District Court refused and certified its order as a final judgment pursuant to Rule 54(b), M.R.Civ.P. Chief Industries appeals.**

**¶2. The sole issue raised on appeal is whether, in a product liability action in which the finished product manufacturer and a component part manufacturer are named defendants, the rights of the finished product manufacturer to indemnity against the component manufacturer are extinguished upon the latter's settlement with the injured party.**

PROCEDURAL AND FACTUAL BACKGROUND

¶3. The Durdens filed this action against Chief Industries to recover damages for carbon monoxide poisoning they allegedly sustained while inhabiting a fifth-wheel trailer manufactured and sold by Chief Industries. The Durden's complaint was also filed against Hydro Flame Corporation, the manufacturer of the trailer furnace which is alleged to have been the source of the carbon monoxide. Chief Industries designed and installed the duct work and exhaust for the furnace which, according to the Durdens' expert, caused the trailer to be defective and unreasonably dangerous. The Durdens predicated each defendant's liability upon theories of breach of warranty and strict liability in tort.

¶4. As to Hydro Flame, the Durdens' complaint asserted that the furnace was defective as evidenced by the development of holes in the heat exchanger portion of the furnace. These holes were alleged to have allowed carbon monoxide to infiltrate the living space of the trailer. As to Chief Industries, the complaint alleged that the trailer was designed and manufactured in a defective and unreasonably dangerous condition because it incorporated a defective heating system, failed to have carbon monoxide detection devices, and failed to include adequate and complete warnings. It further alleged that Chief Industries failed to "properly inspect and test" the furnace.

¶5. Both defendants denied the allegations made in the complaint. Chief Industries filed a cross-claim against Hydro Flame by which it sought indemnity from Hydro Flame in the instance that it was found liable to the Durdens pursuant to a theory of strict liability. Hydro Flame likewise filed an indemnity cross-claim against Chief Industries. Shortly prior to trial the Durdens and Hydro Flame reached a court-approved settlement and the District Court dismissed the cross-claims of both Chief Industries and Hydro Flame with prejudice.

¶6. Following a jury trial between the Durdens and Chief Industries, the District Court granted the Durdens' motion for a directed verdict, finding that the trailer was defective, and granted a new trial on damages. The jury, nevertheless, found no causation between the defect and the Durdens' claimed injuries.

¶7. Following an appeal, we reversed the District Court's grant of judgment as a matter of law, but affirmed the grant of a new trial. Upon remand, Chief Industries sought to have its indemnity cross-claim reinstated by the District Court. The District Court refused and certified its order as final judgment pursuant to Rule 54 (b), M.R.Civ.P. Chief Industries appeals.

## STANDARD OF REVIEW

**¶8. This Court, when examining the trial court's conclusions of law, is required to "determine whether [the district court's] interpretation of the law is correct."** *Stratemeyer v. Lincoln County* **(1996), 276 Mont. 67, 71, 915 P.2d 175, 177. Thus, the standard of review is plenary.** *See Blackwell v. Lurie* **(1997), 284 Mont. 351, 943 P.2d 1318.**

**¶9. This appeal presents a practical dilemma between two competing public policies. One is the promotion of settlements, and the other is the placing of responsibility upon the "up stream" manufacturer of a defective product as opposed to the retailer or distributor of that product.**

**¶10. Chief Industries maintains that the latter policy, placing responsibility upon the "up stream" manufacturer of a defective product, is the more important public policy because in the context of a product liability action, a merchant should be able to claim indemnity from the "up stream" manufacturer who made a defective product sold by the merchant. Only this way, according to Chief Industries, is the party who is ultimately responsible for the defect, the party who pays for the resulting damages.**

**¶11. Hydro Flame, on the other hand, argues for the first policy because given the number of lawsuits filed, and the unavailability of resources and time, it is essential that lawsuits be encouraged to settle. It maintains that there would be little incentive for a manufacturer to settle with a plaintiff if it believed it still had to defend an indemnification cross-claim from a "downstream" retailer or distributor.**

**¶12. In** *State, ex rel., Deere & Co. v. District Court of the Fifth Judicial District* **(1986), 224 Mont. 384, 730 P.2d 396, we considered a settlement between a plaintiff and one of two defendants, and determined that when one defendant in a negligence action settles with the plaintiff it can "buy peace" from not only the plaintiff, but from the other defendants who seek damages in contribution or indemnity, or both, by way of cross-claim.** *Deere* **involved negligence, strict liability, contribution, and indemnity. In our decision in** *Deere,* **we relied upon the language of § 27-1-703, MCA, which concerns negligence, multiple defendants, joint and several liability, and contribution.**

**¶13. This action, on the other hand, is brought pursuant to § 27-1-719, MCA, as it**

existed in 1994. That statute indicates that principles of comparative negligence shall be applicable concerning named defendants; however, notably absent is any mention of multiple defendants or any reference to § 27-1-703, MCA. Section 27-1-703, MCA, is by it its terms limited to negligence actions and does not mention actions in strict liability.

¶14. *Deere* involved a negligence action against the operator of a bulldozer that backed into the plaintiff. The plaintiff also brought suit against the manufacturer of the bulldozer. The manufacturer settled with the plaintiff. The operator sought contribution and indemnity from the manufacturer. We held that a "joint tortfeasor who settles with the claimant before judgment on the claim is entered in a district court is not subject to claims for contribution or indemnity from the nonsettling joint tortfeasors," *Deere*, 224 Mont. at 392, 730 P.2d at 402.

¶15. Chief Industries is correct when it notes that because this case sounds in strict liability and not negligence, § 27-1-703, MCA, does not directly apply to this case. However, the policy statements made in *Deere* with regard to the promotion of settlements in cases in which indemnity is involved, do offer some guidance.

¶16. We recognize the importance of Chief Industries' public policy argument that a judicial system which places liability for injuries from defective products on the manufacturer of the defective product, provides protection for Montana's consuming public and also serves to prevent the inequity of requiring a retailer or distributor to bear the cost of injury created by a manufacturer. We also recognize that a judicial system which allows individual litigants to settle with one defendant in a multiple defendant case conflicts with the rationale for allowing strict liability against "downstream" parties (without proof of fault) in order to allow them to act as a conduit to pass liability "upstream" to the manufacturer of the defective product. It is clear that Montana adopted strict product liability in order to place responsibility upon the manufacturers of defective products. *See Brandenburger v. Toyota Motor Sales U.S.A., Inc.* (1973), 162 Mont. 506, 514, 513 P.2d 268, 273.

¶17. In order to allow "downstream" parties to "act as the conduit through which liability may flow to reach the manufacturer," a Montana federal court allowed cross-claims and third-party complaints for indemnification against a manufacturer. *See Jones v. Aero-Chem Corp.* (D. Mont. 1987), 680 F.Supp. 338, 339. That court stated:

This "upstream" indemnification fosters the policy behind strict products liability by placing final responsibility for injuries caused by a defective product upon the entity initially responsible for placing that product into the stream of commerce.

*Jones*, 680 F.Supp. at 340. *It further stated that "[t]he persons or entities on the chain of distribution of a defective product can be an efficient "conduit" for the imposition of liability on a manufacturer only if they in turn are allowed to seek indemnification from the manufacturer." Jones, 680 F.Supp. at 340. This policy fosters the desire to place responsibility for injury caused by a defective product on the manufacturer of that product and helps prevent inequitable imposition of liability on "downstream" parties.*

¶18. Chief Industries claims that in the absence of imposition of liability on the "upstream" manufacturer, the manufacturer would have little economic incentive to remove a defective product from the market. It argues that the retailer or distributor could always refuse to order that product in the future, but the economic effect on the manufacturer of the loss of these few sales would be extremely limited and have little impact. Finally, Chief Industries maintains that without indemnification, the retailer or distributor might also suffer financial disaster merely because it unknowingly sold a defective product. Indemnity shifts full responsibilities for injury to the manufacturer and provides an incentive to the manufacturer to withdraw or correct the defective product.

¶19. The conflicting public interest presented in this case, however, is that of the encouragement of settlements as we discussed within the context of negligence in *Deere.* In *Deere* we held that a joint tortfeasor who settles with the claimant before judgment on the claim is entered in a district court, is not subject to claims for contribution or indemnity from the nonsettling joint tortfeasors against whom judgment may be rendered. *See Deere*, 224 Mont. at 392, 730 P.2d at 402. This is so even though § 27-1-703, MCA, states that the trier of fact is to determine the degree of negligence among each of the joint tortfeasors. Actual recovery is allowed only against those tortfeasors who have not settled with the claimant.

¶20. The policy reasons for encouraging settlements and avoiding unnecessary litigation are numerous. Settlements may reduce litigants' costs by the elimination of litigation expenses and the risk of an extreme verdict. Settlements eliminate the stress associated with trials. The public may see a reduction in the costs associated with litigation, and a more efficient and timely judicial system. Public policy is served by allowing a litigant to buy his

or her peace and terminate his or her involvement in litigation. As observed by this Court nearly seventy years ago:

The law favors compromises. This is especially true in tort actions, not only because they relieve the labors of courts, and avoid expense, but also because, where the parties agree between themselves upon a settlement of the claim, the result reached is frequently a more equitable adjustment than is possible to be had in a court of law.

*Black v. Martin* (1930), 88 Mont. 256, 269-70, 292 P. 577, 581.

**¶21. Although Chief Industries contends that *Deere* is inapposite to this case as its cross-claim is not based upon negligence, but rather upon strict liability, we note that our holding in *Deere* was not so limited. In *Deere*, we framed the principal issue as follows:**

The principal issue we decide here is that a joint tortfeasor who settles with the claimant before judgment on the claim is entered in a district court is not subject to claims for contribution or indemnity from the nonsettling joint tortfeasors.

*Deere*, 224 Mont. at 386, 730 P.2d at 398. *This statement of a common law principle is not as limited as Chief Industries contends. Given the facts of this case, distinctions which Chief Industries attempts to draw, even if appropriate, do not compel a different result.*

**¶22. The Durdens pled their case, prepared their case, and tried their case as if Hydro Flame and Chief Industries were joint tortfeasors, not as if Chief Industries' liability was predicated solely upon its status as a "seller" pursuant to § 27-1-719, MCA. Because the injury allegedly suffered by the Durdens was carbon monoxide poisoning and the poisoning could have come about from either or both Hydro Flame's product failure or Chief Industries' misinstallation of Hydro Flame's product, then "as a practical matter they both are to blame." *Deere*, 224 Mont. at 398, 730 P.2d at 405. The Durdens' presented trial testimony that there were several defects, that each defect was uniquely traceable to an identified defendant, and that each defect could cause carbon monoxide infiltration. Each, therefore, is alleged to be a joint tort-feasor in strict liability. In *Deere* we broadly stated:**

We discuss first the effect of a prejudgment settlement by one or more joint tortfeasors with a plaintiff on the rights to contribution or indemnity of the remaining nonsettling joint tortfeasors.

*Deere*, 224 Mont. at 387, 730 P.2d at 399.

**¶23. As with § 27-1-703, MCA, confusion reigned at the time we announced our decision in *Deere* as to whether, despite the provision in the statute allowing the trier of fact to determine the degree of negligence among each joint tortfeasor, the right of a settling tortfeasor to be free from claims of contribution or indemnity from nonsettling tortfeasors was derived from common law principles, and not from anything set forth in the statute. In *Deere* we noted that in *Kussler v. Burlington Northern, Inc.* (1980), 186 Mont. 82, 606 P.2d 520, we adopted the rule of the Restatement (Second) of Torts, § 885 (1985) which established that the release of one joint tortfeasor is not a release of any other joint tortfeasors unless the document is intended to release the other tortfeasors, or the payment is full compensation, or the release expressly so provides. We stated that:**

[I]n the case at bar then, following *Kussler*, there can be no doubt that as between the plaintiff Campbell and Deere & Company, the latter defendant is completely exonerated from any further liability for damages to Campbell. If therefore, following Deere's compromise settlement with Campbell, Wade's Backhoe can bring Deere & Company back into the action on a theory of contribution between joint tortfeasors, the finality of Deere's compromise settlement is in serious question.

*Deere*, 224 Mont. at 392, 730 P.2d at 402.

**¶24. Our resolution of the issue in *Deere*, thus, clearly provided that our conclusion was based on common law principles, and was not dependent on the language of § 27-1-703, MCA:**

Consequently, under amended § 27-1-703, there is no right of contribution under Montana

law in favor of a joint tortfeasor or tortfeasors against whom judgment for the plaintiff is entered from other joint tortfeasors who have settled with the plaintiff prior to judgment. The judicial tenets that the law favors compromise and that a compromising party ought to be able to buy his peace with finality override the seeming unfairness to non-settling parties who did not participate in the compromise nor control its direction.

*Deere,* 224 Mont. at 393, 730 P.2d at 402.

**¶25. Contribution distributes loss among joint tortfeasors by requiring each to pay his or her proportionate share based upon his or her proportion of the negligence which proximately caused the injuries. *See Raisler v. Burlington Northern R.R.* (1985), 219 Mont. 254, 258, 717 P.2d 535, 537. Indemnity, on the other hand, shifts the entire loss from the one who has been required to pay it to the one who should bear the loss. *See Raisler,* 219 Mont. at 258, 717 P.2d at 537. The right to indemnity is an equitable principle, based on the general theory that one compelled to pay for damages caused by another should be able to seek recovery from that party. *See Poulsen v. Treasure State Indus.* (1981), 192 Mont. 69, 82, 626 P.2d 822, 829.**

**¶26. In *Deere*, we noted that "[t]he remedies of indemnity and contribution are in theory mutually exclusive. Indemnity is an all-or-nothing proposition, representing in effect total contribution." *Deere*, 224 Mont. at 398, 730 P.2d at 405. In light of that observation, it is clear from *Deere* that a "joint tortfeasor" who settles with the claimant is not subject to claims for contribution or indemnity from the nonsettling joint tortfeasors. Our decision is equally applicable to contribution claims in negligence cases, as it is to indemnity claims in product liability cases.**

**¶27. Since our adoption of strict liability in *Brandenburger v. Toyota Motor Sales U.S.A.* (1973), 162 Mont. 506, 513 P.2d 268, its primary objective has always been to place responsibility for injuries caused by defective products on those responsible for placing those products in the stream of commerce, not on the consumer. Moreover, the policy which led courts initially to allow strict liability claims against retailers and wholesalers of defective products was likewise to ensure maximum protection to the injured plaintiff, not out of any concern for the fair apportionment of liability between tortfeasors. As explained by the California Supreme Court in *Vandermark v. Ford Motor Co.* (Cal. 1964), 391 P.2d 168, the first decision extending strict liability to a retailer:**

Retailers like manufacturers are engaged in the business of distributing goods to the public. They are an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products. *In some cases the retailer may be the only member of that enterprise reasonably available to the injured plaintiff. In other cases the retailer himself may play a substantial part in insuring that the product is safe or may be in a position to exert pressure on the manufacturer to that end; the retailer's strict liability thus serves as an added incentive to safety.* Strict liability on the manufacturer and retailer alike affords maximum protection to the injured plaintiff *and works no injustice to the defendants, for they can adjust the costs of such protection between them in the course of their continuing business relationship.*

*Vandermark,* 391 P.2d 171-72 (emphasis added) (citations omitted).

**¶28. A system which allows indemnity claims to be maintained in product liability actions in which one of the defendants chooses to settle with the plaintiff would discourage settlements because there would be little incentive for a manufacturer to settle if it still had to defend an indemnification claim. It would also force injured consumers into protracted litigation that, due to the vagaries of our justice system and the expense of litigation, might result in an inadequate recovery or no recovery at all. Moreover, such a system would make it virtually impossible for less than all defendants to settle a case. No defendant would ever settle if it thought it could be brought back into the action and have to pay attorney fees and a potential judgment. On the other hand, by following the policy articulated in *Deere*, defendants who do not settle will be put at risk if other defendants settle. In the long run, this will promote settlement rather than trials.**

**¶29. In most instances, the consuming public has little interest in who pays for the damages caused by the use of a defective product as among the retailer, wholesaler, or manufacturer. However, in all cases, the public has a strong interest in seeing that compensation is made for the physical, emotional, and often catastrophic injuries caused by the use of a defectively made product. We agree with the District Court that this interest far outweighs any interest an individual retailer or wholesaler of a defective product might have in placing ultimate responsibility on the manufacturer.**

**¶30. Finally, Chief Industries asserts that the policy articulated in *Deere* will cause**

plaintiffs to settle for less than full value with manufacturers and then leave local "mom and pop" retailers to pay for an unfair amount of remaining damages. The dissent expresses the same concern. Such a view assumes that an injured plaintiff would rather settle, for less than the actual damages, with an out of state defendant which manufactured a defective product and go to trial against a local business which is only secondarily liable. There is no basis in fact for such an assumption and it flies in the face of sound litigation strategy and common sense.

¶31. Accordingly, we conclude that in accordance with well established common law principles and the public policy favoring settlements, a settlement by one tortfeasor precludes claims for both contribution and indemnity against the settling tortfeasor, irrespective of the nature of the underlying tort claim.

¶32. The judgment of the District Court is affirmed.

/S/ JIM REGNIER

We Concur:


/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ WILLIAM E. HUNT, SR.

/S/ TERRY N. TRIEWEILER


Justice James C. Nelson dissents.


## Introduction

¶33. As the majority opinion points out, resolution of the issue on appeal presents a practical dilemma of choosing between two competing public policies--one favoring settlements and the other favoring placing responsibility upon the "up stream" manufacturer of a defective product notwithstanding that the manufacturer is released from liability by the injured plaintiff. In the context of this case--a strict products liability action--I cannot agree with the Court that the former policy must take precedence over the latter. To the contrary, I conclude that the latter policy must control. Indeed, the majority's resolution of the policy issue flies directly in the face of this Court's long-standing, consistent adherence to the core principle of strict liability in tort--that of placing liability on the party primarily responsible for the injury occurring. Our decision significantly compromises this principle and disserves the consuming public for whose protection we adopted the doctrine of strict products liability in the first place. Accordingly, I respectfully dissent.

## Discussion

¶34. Montana adopted the doctrine of strict liability in tort in *Brandenburger v. Toyota Motor Sales U.S.A., Inc.* (1973), 162 Mont. 506, 513 P.2d 268. We did so based upon important public policy considerations to which we have consistently adhered for the past two-plus decades. *Sternhagen v. Dow Co.* (1997), 282 Mont. 168, 174, 935 P.2d 1139, 1142. Specifically, "the doctrine of strict liability was evolved to place liability on the party primarily responsible for the injury occurring, that is, the manufacturer of the defective product." *Brandenburger*, 162 Mont at 514, 513 P.2d at 273 (quoting *Lechuga, Inc. v. Montgomery* (1970), 12 Ariz. App. 32, 467 P.2d 256, 261 (Jacobson, J., concurring)).

¶35. The important public policy considerations which we articulated in *Brandenburger* in support of our adoption of the strict liability doctrine include:

1. The manufacturer can anticipate some hazards and guard against their recurrence, which the consumer cannot do.

2. The cost of injury may be overwhelming to the person injured while the risk of injury can be insured by the manufacturer and be distributed among the public as a cost of doing business.

3. It is in the public interest to discourage the marketing of defective products.

4. It is in the public interest to place responsibility for injury upon the manufacturer who was responsible for [the defective product] reaching the market.

5. This responsibility should also be placed upon the retailer and wholesaler[1] of the defective product in order that they may act as the conduit through which liability may flow to reach the manufacturer, where ultimate responsibility lies.

6. Because of the complexity of present day manufacturing processes and their secretiveness, the ability to prove negligent conduct by the injured plaintiff is almost impossible.

7. The consumer does not have the ability to investigate for himself the soundness of the product.

8. The consumer's vigilance has been lulled by advertising, marketing devices and trademarks.

*Brandenburger*, *162 Mont. at 514-15, 513 P.2d at 273 (citations omitted).*

**¶36. Summarizing these policy considerations, we stated:**

[t]he essential rationale for imposing the doctrine of strict liability in tort is that such imposition affords the consuming public the maximum protection from dangerous defects in manufactured products by requiring the manufacturer to bear the burden of injuries and losses enhanced by such defects in its products.

No

*Brandenburger, 162 Mont. at 517, 513 P.2d at 275. Furthermore, in the twenty-plus years since we adopted the doctrine we have steadfastly rejected attempts by others to*

inject negligence principles into strict liability law and thereby sever Montana's strict products liability law from the core principles for which it was adopted--maximum protection for consumers against dangerous defects in manufactured products with the focus on the condition of the product, and not on the manufacturer's conduct or knowledge.

*Sternhagen, 282 Mont. at 176, 935 P.2d at 1144 (holding that "state-of-the-art" evidence is not admissible in a strict products liability action).*

**¶37. Indeed, we have chosen**

to continue to adhere to the clear precedent we have heretofore established which focuses on the core principles and remedial purposes underlying strict products liability [because] [s]trict liability without regard to fault is the only doctrine that fulfills the public interest goals of protecting consumers, compensating the injured and making those who profit from the market bear the risks and costs associated with the defective or dangerous products which they place in the stream of commerce.

*Sternhagen, 282 Mont. at 182, 935 P.2d at 1147 (citing Brandenburger, 513 P.2d at 273).*

**¶38. Recognizing this Court's adherence to these core principles, the federal district court in *Jones v. Aero-Chem Corp.* (D. Mont. 1987), 680 F. Supp. 338, had no difficulty in concluding that allowing actions for indemnity in strict products liability cases was entirely consistent with Montana's strong commitment to the protection of the consuming public. The federal district court was entirely correct in its conclusion.**

**¶39. In *Aero-Chem*, the plaintiff, Jones, sued the manufacturer of a defective tear gas canister, Aero-Chem, for injuries she sustained when the canister accidentally discharged. By way of a third party action, Aero-Chem sought indemnity from the designer/manufacturer of a defective valve incorporated into the canister, Emson. *Aero-Chem*, 680 F. Supp. at 338-39. The court denied Emson's motion for summary**

judgment noting, first, that, while we had not addressed the question, "[t]he decisional law extant in Montana . . . provides clear guidance as to what the Montana Supreme Court would conclude if presented with the precise issue." *Aero-Chem*, 680 F. Supp. at 339. Pointing to our "unequivocal[]" adoption of Section 402A of the Restatement of Torts in *Brandenburger* and to our adoption of the equitable principle of indemnity in *Poulsen v. Treasure State Industries, Inc.*(1981), 192 Mont. 69, 82, 626 P.2d 822, 829, the court found the two theories perfectly compatible:

The principle of indemnity, like the doctrine of strict products liability, is bottomed on the desire of the public to impose liability for an injury on the person or entity primarily responsible for that injury.

Recognition of the fact that the doctrine of strict products liability and the principle of indemnity are premised on the same public concern, leads to the logical conclusion that the public interest is best served by allowing indemnity based on the principle of strict products liability. There is nothing inherent in the principle of indemnity which makes it inapplicable to strict products liability actions, nor visa versa. Not only are the principles compatible but they both serve to accomplish the same result.

\* \* \* \*

"[U]pstream" indemnification fosters the policy behind strict products liability by placing final responsibility for injuries caused by a defective product upon the entity initially responsible for placing that product into the stream of commerce.

*Aero-Chem*, 680 F. Supp. at 339-40. I completely concur in this rationale.

¶40. Indeed, as pointed out above, in *Brandenburger* this Court observed that by allowing the injured consumer to hold retailers of the defective product also responsible, those entities may, thereby, serve as an effective "conduit" through which liability may flow to reach the manufacturer, where ultimate responsibility lies. *Brandenburger*, 162 Mont. at 514, 513 P.2d at 273. Obviously, this important policy reason for adopting strict liability in tort is completely frustrated to the extent

that the retailer is prohibited from seeking indemnification from the manufacturer. Quite to the contrary, the "ultimately responsible" manufacturer can, via settlement, effectively shift the damages caused by its placing the defective product into the stream of commerce to downstream retailers who did nothing more than unwittingly sell the defective product to the consumer. See *Aero-Chem,* 680 F. Supp. at 340.

¶41. Furthermore, allowing the manufacturer of a defective product to "buy its peace" serves as a disincentive for it to "anticipate . . . hazards and to guard against their recurrence." *Brandenburger*, 156 Mont. at 514, 513 P.2d at 273 (citation omitted). Why spend the money to design and build a safer product, when the manufacturer's economists and accountants can demonstrate that it will cost less in the long run to simply settle the few law suits that will inevitably result from injuries caused by the defective product, without incurring any risk of having to indemnify downstream defendants?

¶42. Rather than "discourag[ing] the marketing of defective products" and requiring the manufacturer to insure the risk of injury and distribute that expense among the public as a cost of doing business," see *Brandenburger,* 162 Mont. at 514, 513 P.2d at 273, our decision in the case *sub judice* even more will encourage manufacturers to do what they already do-- analyze decisions to market or to continue marketing defective products on the basis of the cost/benefit ratio. That is, if the accounting department can show that the manufacturer will likely have to pay $1.50 per unit to settle anticipated personal injury cases caused by the product's defective design or fabrication, but that it will cost $2.75 per unit to make the product safer, the benefit of marketing the defective product will outweigh the cost of improving it. The result? The manufacturer will continue to market the product with the defect. So what if a few hundred or a few thousand people a year are killed or maimed by the product? At least profits will be maximized!

¶43. Adopting a public policy of allowing the manufacturer in a strict products liability case to "buy its peace" one case at a time without risk of indemnity may well benefit the individual plaintiff. Such a policy does absolutely nothing, however, to uphold, much less advance, the core principles of strict liability in tort--that of protecting the consuming public and placing ultimate financial responsibility on the manufacturer. Under such a policy the individual plaintiff may win the battle but the consuming public will most assuredly lose the war.

¶44. Likewise, allowing the "ultimately responsible" manufacturer to settle out of a products liability case free of any risk of a later indemnity action fails to foster the other public policy considerations articulated in *Brandenburger*. What will force a manufacturer to disclose complicated manufacturing processes or damning, secret, intra-organization test reports or memoranda concerning its defective product if the manufacturer can place the product into the stream of commence knowing full well that it can settle out of individual lawsuits with no risk of ever having its ultimate responsibility determined? What will protect other consumers who have no more ability than the injured plaintiff to investigate the soundness of the product and who are, likewise, lulled by advertising, marketing devices and trademarks, from the manufacturer's cost/benefit-driven decision to continue marketing the defective product? See *Brandenburger*, 162 Mont. at 515, 513 P.2d at 273.

¶45. Having adopted the theory of strict liability in tort for the purpose of assuring that liability for putting a defective product into the stream of commerce is placed on the party primarily responsible for the injury occurring, that is, on the manufacturer, I can discern absolutely no way in which our instant decision fosters that or any of the other important public policy considerations articulated in *Brandenburger* or in our subsequent products liability case law. In fact, as pointed out above, the reverse is true.

¶46. In short, as the federal court in *Aero-Chem* correctly stated:

No compelling justification exists which warrants relieving the manufacturer of a defective product from responsibility for damages caused by that entity's product. Ultimate liability for injury emanating from a defective product should be placed upon that entity responsible for creation of the product. [citation omitted]. Ultimate responsibility should not be fixed simply by the fact that an injured consumer chooses to seek compensation from one commercial entity rather than another.

*Aero-Chem*, 680 F. Supp. at 341. *A more enlightened approach would allow a downstream retailer of a defective product or defective component part of a product to seek indemnity from the upstream manufacturer of the product or component part.*

¶47. The majority rejects this approach, however. Rather, the Court trumpets policy reasons for encouraging settlements and avoiding "unnecessary" litigation--i.e.

reducing costs, eliminating the risk of extreme verdicts, lessening trial stress, and efficiently using judicial resources. No doubt these are legitimate policy reasons favoring settlements in negligence actions and in many other sorts of lawsuits. As facially persuasive (though speculative) as they are, however, these reasons are antithetical to the core principles of strict liability in tort articulated at length above.

¶48. The essential rationale of strict products liability is to benefit the consuming public, not the individual plaintiff. We adopted strict liability in tort to "afford the consuming public the maximum protection from dangerous defects in manufactured products by requiring the manufacturer to bear the burden of injuries and losses enhanced by such defects in its products." *Brandenburger*, 162 Mont. at 517, 513 P.2d at 275. To this end, we will not permit manufactures to use the "state-of-the-art" defense in strict products liability actions because to do so, "would inject negligence principles into strict liability law and thereby sever Montana's strict products liability law from the core principles for which it was adopted--maximum protection for consumers . . . with the focus on the condition of the product, and not on the manufacturer's conduct or knowledge." *Sternhagen*, 282 Mont. at 176, 935 P.2d at 1144.

¶49. Yet, in the case at bar, we are content to throw these core, remedial principles to the wind in favor of some theoretical benefit to some future plaintiff[2] who, for whatever reason, chooses to settle with the manufacturer of the defective product leaving the retailer--merely a "conduit" to the "ultimately responsible" manufacturer--to shoulder the financial burden. True, maybe the plaintiff will not have to try part of his or her case; maybe he or she can obtain, via the settlement, some seed money to finance the remaining claim against the retailer; maybe some trial costs will be saved; and maybe some judicial resources will be conserved. Nevertheless, given the lofty reasons *why* we adopted the theory of strict liability in tort, I am mystified by our present about-face, rejection of these core principles. There simply is no justification for our determination that a few speculative benefits which might accrue to one plaintiff should trump the very real and greater benefit of protecting all consumers from dangerous product defects. Nor should we preclude the fact-finder from determining the manufacturer's liability and, if found to be responsible, from holding it financially accountable in a suit for indemnification.

¶50. And, that is not all that is wrong with this picture. As much as the majority tries to pound the square peg of settlement--by application of *State ex. rel. Deere & Co. v.*

*District Court* (1986), 224 Mont. 384, 730 P.2d 396--into the round hole of strict liability in tort, its attempt is unavailing. The Court tries to distance the case from its roots, but the fact is *Deere* was decided as a negligence/comparative negligence case under § 27-1-703, MCA, not as a strict liability case under § 27-1-719, MCA. See *Deere*, 224 Mont. at 393, 730 P.2d at 402. Even the trial court acknowledged that *Deere* was not directly on point.

¶51. In *Deere*, the plaintiff was injured by a bulldozer manufactured by Deere and operated by Wade's Backhoe. Plaintiff's complaint alleged that Deere negligently designed the bulldozer and that Wade's Backhoe negligently operated it. Plaintiff settled with Deere. Wade's Backhoe then filed a third party complaint for indemnity and contribution against Deere. Count one of the third party complaint alleged strict liability for defective manufacture against Deere; counts two and three alleged negligent design and failure to warn. On denial of its motion for summary judgment based on settlement, Deere applied for, and we accepted supervisory control. *Deere*, 246 Mont. at 386, 730 P.2d at 398.

¶52. We decided *Deere* on the issue of whether the third party complainant, Wade's Backhoe, could bring an action for contribution against the settled and released joint tortfeasor, Deere. See *Deere*, 246 Mont. at 387, 730 P.2d at 399.[3] Following a lengthy discussion and review of Montana's negligence law we resolved the issue in Deere's favor, citing § 27-1-703, MCA. We stated:

In Montana, there is but one statute on the subject, the amended Sec. 27-1-703, MCA, and *from it* we determine that a joint tortfeasor who settles with the claimant before judgment on the claim is entered in a district court is not subject to claims for contribution or indemnity from the non-settling joint tortfeasors against whom judgment may be rendered. Even though the amended section does give a sued joint tortfeasor the right to bring in other joint tortfeasors as defendants in order to insure contribution, and even though the section states that the trier of fact is to determine the degree of negligence among each of the joint tortfeasors, *the right of contribution under the amended statute is "proportional to the negligence of the parties against whom recovery is allowed." Clearly that statutory language excludes a party against whom recovery is not allowed, e.g. a tortfeasor who has previously settled.*

*Deere, 246 Mont. at 393, 730 P.2d at 402 (emphasis added). Thus, contrary to the majority's pronouncement*

*that Deere was resolved on "common law principles and was not dependent on the language of § 27-1-703, MCA," the opposite is true. In fact, the contribution issue was reviewed, discussed and decided by this Court entirely within the context of negligence and comparative negligence principles and was clearly decided by reference to the negligence/comparative negligence statute. Importantly, absolutely no reference was made to the strict liability statute, § 27-1-719, MCA, adopted years before.*

**¶53. Again, in applying *Deere* to the strict products liability case at bar, the majority has simply ignored this Court's consistent rejection of attempts to inject negligence principles into strict liability in tort and its steadfast refusal to sever Montana's strict products liability law from its core, remedial principles of providing maximum protection to consumers of defective products and placing financial responsibility on the "ultimately responsible" manufacturer regardless of its conduct or knowledge. *Sternhagen,* 282 Mont. at 176, 935 P.2d at 1144. The majority does not stop there, however.**

**¶54. Recognizing that indemnity "shifts the entire loss from the one who has been required to pay it to the one who should bear the loss"--precisely the underlying rationale of strict liability in tort--the Court then goes on to disallow indemnity actions in strict liability cases. With passing reference to *Deere* (which, as demonstrated above, is completely inapplicable) and with lip-service to *Brandenburger* (which is what this case is actually about), the majority, without further authority or any real analysis, rejects indemnity in strict liability cases, concluding that to allow such actions would discourage settlements. Assuming that is true, so what? As previously discussed, this whole approach is bogus in the context of a strict liability case. The Court's overarching concern for settlements is misplaced.**

**¶55. Moreover, I take particular exception to the majority's statement that the consuming public has little interest in who pays for the damages caused by the use of a defective product but that the public has a strong interest in seeing that the injured person is compensated for his or her injuries. Actually, the *public* wants defective and dangerous products removed from this nation's store shelves so that members of the *public* will not be injured. The *plaintiff* wants to be compensated. Where that compensation comes from is immaterial to the *plaintiff.* Strict liability in tort was adopted to serve both goals. *Brandenburger*, 162 Mont. at 514-15, 513 P.2d at 273. Settlement serves only the latter.**

**¶56. And that is precisely the point that seems to be lost on the majority. Allowing upstream indemnity actions will not preclude the injured plaintiff from ultimately**

obtaining full compensation for his or her injuries. While the plaintiff may actually have to try the case, juries are more than willing to fairly compensate injured plaintiffs for injuries in products liability cases. In fact, if anything, modern experience demonstrates that in products liability cases, trial juries award not only substantial compensatory damages, but, often, punitive damages as well--especially where manufacturers are shown to have callously disregarded issues of product safety. (And, if that were not true, "tort reformers" would not be falling all over themselves to put caps on damages and to deny Americans meaningful access to the courts and to full legal redress for their injuries).

¶57. Moreover, allowing indemnity actions in strict liability cases may actually promote settlements. Retailers may be more willing to settle if those entities know that they can seek indemnity from the upstream manufacturer. Similarly, manufacturers, knowing that they will have to indemnify downstream retailers, will likely be more inclined to make good faith settlement offers, rather than simply "buying their peace" for bottom dollar.

## Conclusion

¶58. Allowing indemnity actions in the context of product liability cases serves the precise goals for which we adopted strict liability in tort in the first place--maximum protection for consumers against dangerous defects in manufactured products with financial responsibility being placed on the "ultimately responsible" entity that placed the defective product into the stream of commerce. Disallowing indemnity actions by application of negligence/settlement principles in products liability cases disserves and frustrates these goals. Moreover, it is as likely that settlements will be promoted by allowing indemnity actions as it is that settlements will be discouraged. However, even accepting at face value the majority's rationale that settlements will be more difficult, the possibility of lessening a plaintiff's opportunities for settlement without diminishing his or her ultimate right of full legal redress is a reasonable price to insure the greater public good.

¶59. I would reverse the decision of the District Court, and I respectfully dissent from our failure to do so.

/S/ JAMES C. NELSON

District Judge Michael Prezeau, sitting for Justice W. William Leaphart, concurs in the foregoing dissent.

/S/ MICHAEL PREZEAU

1. [1] Throughout the remainder of this dissent I refer only to "retailers" rather than "retailers and wholesalers" except where the dual reference is made in quoted material. I do this only for stylistic reasons. Obviously, under our products liability law, retailers and wholesalers can be held equally liable since both are in the stream of commerce.

2. [2] Ironically, the Plaintiffs in the instant case will be neither helped nor harmed by our decision. They have already settled with everybody. In this case the winner is the manufacturer of the defective product and the losers are the downstream defendants and the consuming public.

3. [3] We also considered whether Wade's Backhoe's indemnity claim mandated keeping Deere in the suit. We concluded, however, that the third party complainant had not stated a cause of implied indemnity as a matter of law. *Deere*, 246 Mont. at 398-99, 730 P.2d at 405-06.